*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 40**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

IN RE GESTATIONAL AGREEMENT

N.T.B, J.G.M., D.B., and G.M.,
*Petitioners and Appellants*

No. 20160796
Filed August 1, 2019

On Direct Appeal

Fifth District, St. George
The Honorable Jeffrey C. Wilcox
No. 162500035

Attorneys:

Edwin S. Wall, Damian E. Davenport, Salt Lake City,
for petitioners and appellants

Sean D. Reyes, Att'y Gen, Tyler R. Green, Solic. Gen.,
Brent A. Burnett, Asst. Solic. Gen., Salt Lake City,
for amici State of Utah

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, JUSTICE PEARCE,
and JUDGE DIREDA joined.

JUSTICE PEARCE filed a concurring opinion in which
JUSTICE HIMONAS joined.

ASSOCIATE CHIEF JUSTICE LEE filed a concurring opinion.

Due to her retirement, JUSTICE DURHAM did not participate herein;
and DISTRICT COURT JUDGE MICHAEL D. DIREDA sat.

JUSTICE PETERSEN became a member of the Court on
November 17, 2017, after oral argument in this matter, and
accordingly did not participate

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1    This appeal comes to us unopposed. A married couple, both men, wish to become parents. The couple entered into an agreement with a woman and her husband to have the woman act as a gestational surrogate, carrying a fertilized embryo that contains the genetic material of one of the couple. In Utah, by statute, this type of "gestational agreement" "is not enforceable" unless it is "validated by a tribunal."[1] A court "may issue an order validating the gestational agreement" "only on finding that" certain conditions are met, one such condition being that "medical evidence" must be presented "show[ing] that the intended mother is unable to bear a child or is unable to do so without unreasonable risk to her physical or mental health or to the unborn child."[2]

¶2    The intended parents, prospective gestational mother, and her husband (collectively, Petitioners) filed a joint petition, pursuant to the statute, requesting that the district court validate their gestational agreement. The court denied the petition, reasoning that the statute's use of the words "*mother* and *her* plainly refer to a woman," and concluding that because "neither of the legally married intended parents are women the Court must deny their petition." Petitioners appealed, and the court of appeals certified the case to us.

¶3    Petitioners argue, first, that the statute, as interpreted by the district court, violates the Uniform Operation of Laws provision of the Utah Constitution, as well as the Due Process and Equal Protection Clauses of the United States Constitution. They also make a statutory interpretation argument, asserting that the word "mother" should be interpreted in a gender-neutral way to mean "parent." The State of Utah has submitted an amicus brief agreeing with Petitioners' second argument and urging us to interpret the statute in a gender-neutral fashion so as to avoid the constitutional questions. The State relies on a statutory rule of construction instructing courts to interpret a "word used in one gender [to] include[] the other gender" when doing so would not be "inconsistent with the manifest intent of the Legislature," or

---

[1] UTAH CODE § 78B-15-809(1).

[2] *Id.* § 78B-15-803(1), (2).

"repugnant to the context of the statute."[3] According to the State, this rule of construction requires us to read the word "mother" as "father" or "parent."

¶4 But Petitioners' and the State's proposed statutory interpretation is "inconsistent with the manifest intent of the Legislature" and "repugnant to the context of the statute."[4] Their

---

[3] *See id.* § 68-3-12(1).

[4] It is important to explain the meaning of the word "repugnant" in the statutory phrase "repugnant to the context of the statute." *See* UTAH CODE § 68-3-12. Although the term "repugnant" is often used to describe matters that are "distasteful, objectionable, or offensive," *Repugnant*, DICTIONARY.COM, www.dictionary.com/browse/repugnant? (last accessed Jan. 08, 2018), when used in a statutory context, as in section 68-3-12, "repugnant" generally is defined as "[i]nconsistent or irreconcilable with," or "contrary or contradictory to," *Repugnant*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Pac. Disc. Co. v. Jackson,* 179 A.2d 745, 747 (N.J. 1962) ("In statutory construction, repugnant is perhaps best equated with irreconcilable conflict."); *Repugnancy*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An inconsistency or contradiction between two or more parts of a legal instrument (such as a contract or statute)."). We have repeatedly applied this latter meaning of the term when dealing with statutes repealed by implication. *See, e.g., Nelden v. Clark,* 59 P. 524, 525–26 (Utah 1899) ("If section 286 is *repugnant* to section 206, or *so contradictory or irreconcilably in conflict* with it that the two sections cannot be harmonized in order to effect the purposes of their enactment, then the later act may repeal the former . . . . So, if an earlier statute is impliedly repealed by a later one on account of *repugnancy or inconsistency* between the two, the repeal will be measured by the extent of the conflict or inconsistency between the acts . . . ." (emphases added)); *Union Pac. R.R. Co. v. Pub. Serv. Comm'n,* 134 P.2d 469, 474 (Utah 1943) ("It is elementary that statute may be repealed by implication . . . where the provisions of a latter statute are clearly and manifestly repugnant to the provisions of existing statutes . . . . Such repeals, however, are not favored, and if two apparently conflicting acts can be reasonably construed so as to reconcile and give effect to each, such construction should be adopted."). We likewise apply the same meaning here. Thus, in concluding that the proposed interpretation is "repugnant to the context of the statute" under section 68-3-12, we mean it is

(Continued)

suggested reading would effectively nullify the requirement that an intended mother show medical evidence that she is unable to bear a child altogether or without serious risk of harm to her or the child—an action that would undercut the legislature's intention. Additionally, their proposal contradicts provisions within the Utah Uniform Parentage Act (Act)[5]—the act encompassing the gestational agreement statute—that explicitly separate "mother" and "father" into distinct gender-specific terms. Because Petitioners' and the State's proposed interpretation is inconsistent with the manifest intent of the legislature and repugnant to the context of the statute, we are statutorily precluded from applying the suggested rule of construction. We therefore hold that the district court's interpretation is consistent with the manifest intent of the legislature and thus address the constitutional challenge to the statute.

¶5     Under the district court's interpretation, the intended mother requirement precludes married same-sex male couples from obtaining a valid gestational agreement—a benefit statutorily linked to marriage. Petitioners argue that recent United States Supreme Court precedent precludes states from denying similarly situated same-sex couples marital benefits afforded to couples of the opposite sex,[6] and the State does not oppose this argument. Accordingly, we hold section 78B-15-803(2)(b) unconstitutional. We further hold that the unconstitutional subsection should be severed, leaving the remainder of the statute intact, because doing so would not disrupt the overall operation of the Act or undermine the legislature's intent

---

"inconsistent, irreconcilable, or in disagreement with the other language of [the] statute,'" *Laase v. 2007 Chevrolet Tahoe*, 776 N.W.2d 431, 437 (Minn. 2009) (citation omitted) (internal quotation marks omitted), or "contrary to the purpose of the statute," *Commonwealth v. Bradley*, 998 N.E.2d 774, 779 (Mass. 2013).

[5] UTAH CODE § 78B-15-101 to -902.

[6] *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015) ("[T]he State laws challenged by Petitioners in these cases are now held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples."); *Pavan v. Smith*, 137 S. Ct. 2075, 2078 (2017) (concluding that states may not deny "married same-sex couples access to the 'constellation of benefits that the Stat[e] ha[s] linked to marriage'" (alterations in original) (quoting *Obergefell*, 135 S. Ct. at 2601)).

in enacting the statute. We therefore reverse and remand for further proceedings consistent with this opinion.

## Background

¶6 Petitioners N.T.B. and J.G.M. (Intended Parents) are a married same-sex male couple. Petitioners D.B. and G.M. are an opposite-sex married couple who entered into a written gestational surrogacy agreement with the Intended Parents. The four individuals filed a joint petition requesting that the district court validate their agreement, in accordance with the statutory scheme contained in Utah Code sections 78B-15-801 through 809, the provisions of the Utah Uniform Parentage Act dealing with gestational agreements. After reviewing Petitioners' joint memorandum in support of the petition and holding a telephonic hearing on the matter, the district court issued an order denying the petition.

¶7 In its order, the district court expressed "concern[] about the language of" Utah Code section 78B-15-803(2)(b), which requires, as a prerequisite to court approval, the court to find that "medical evidence shows that the intended mother is unable to bear a child or is unable to do so without unreasonable risk to her physical or mental health or to the unborn child." The district court noted that Petitioners had "filed a well written and researched" memorandum supporting their petition, and had, at the hearing, "presented additional well-reasoned arguments as to why the Court should interpret the above statutory language in a gender neutral fashion." The district court went so far as to note that "Petitioners' reasoning is sound," but nevertheless concluded that it could not "say that the legislature intended [Utah Code section 78B-15-803(2)(b)] to be gender neutral." Instead, the court concluded that "the word[s] *mother* and *her* plainly refer to a woman," and, accordingly, found itself "bound to apply the statute as written." The court concluded that, because "neither of the legally married intended parents are women," it "must deny their petition."

¶8 The Petitioners appealed, again unopposed. Before the court of appeals set a briefing schedule, Petitioners moved for summary disposition under rule 10(a)(2)(B) of the Utah Rules of Appellate Procedure, seeking reversal on the basis of "manifest error." The court of appeals denied the motion, concluding that "the outcome [Petitioners] request requires statutory interpretation and is a matter of first impression," making summary disposition inappropriate. The court of appeals then certified the case to this court. As we

further discuss below, we have jurisdiction under Utah Code section 78A-3-102(3)(b).

## Standard of Review

¶9    The Petitioners raise two issues on appeal: first, whether the district court misinterpreted the applicable statute by failing to "give [it] a gender neutral reading," and second, whether, under the district court's reading, the statute is unconstitutional under either the state or federal constitution. The proper interpretation of a statute and its constitutionality are questions of law that we review for correctness.[7]

## Analysis

¶10 Petitioners first argue that the district court misinterpreted the Utah Code by failing to read the statute in a gender-neutral way in order to avoid constitutional concerns. The State agrees with Petitioners and urges us to interpret "mother" to mean "father" or "parent," relying on our rules of statutory construction for support. Employing our rules of statutory construction and the canon of constitutional avoidance to construe the statute in a gender-neutral manner is inconsistent, however, with the manifest intent of the legislature and is repugnant to the context of the statute. We therefore interpret "mother" in section 78B-15-803(2)(b) of the Utah Code to mean "female parent," thereby compelling a constitutional analysis of the statute. Because a plain reading of section 78B-15-803(2)(b) works to deny certain same-sex married couples a marital benefit freely afforded to opposite-sex married couples, we hold the statute violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, under the analysis set forth in *Obergefell*.[8] We likewise hold that section 78B-15-803(2)(b) is severable from the Act.

---

[7] *State v. Outzen*, 2017 UT 30, ¶ 5, 408 P.3d 334 ("We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." (citation omitted) (internal quotation marks omitted)); *State v. Greenwood*, 2012 UT 48, ¶ 26, 297 P.3d 556 ("[T]he law is clear that appellate courts review the constitutionality of a statute for correctness, giving no deference to the lower court's interpretation.").

[8] 135 S. Ct. 2584 (2015).

## I. We Have Jurisdiction to Hear This Case

¶11 Before reviewing Petitioners' arguments, we must first address the question of jurisdiction. As noted above, this case comes before us in a unique posture. By statute, all parties must *jointly* file a petition with the district court in order to validate a gestational agreement. Utah Code expressly states that the court may issue an order validating a gestational agreement only on a finding that, among other things, "*all parties* have voluntarily entered into the agreement and understand its terms."[9] The entire proceeding is therefore predicated on the complete agreement of the relevant parties; no adverse party may exist. Indeed, no respondent participated in the proceedings before the district court in this case and none appears before us now on appeal.[10] So by statutory scheme, there is no controversy between adverse parties before us.

¶12 Ordinarily, the lack of adversariness present here would raise constitutional questions of justiciability. The Utah Constitution vests the courts with the "judicial power of the state,"[11] and therefore "we are constitutionally limited to wield only 'judicial power.'"[12] This "judicial power . . . is generally understood to be the power to hear and determine *controversies between adverse parties*."[13] Thus, generally, in "the absence of any justiciable controversy between

---

[9] UTAH CODE § 78B-15-803(2)(e) (emphasis added).

[10] While the State has submitted a brief on appeal, it was in response to the notice Petitioners were required to provide the State pursuant to rule 25A of the Utah Rules of Appellate Procedure of their constitutional challenge. The State is not a defendant or respondent in this case, but merely an amicus under the rules.

[11] UTAH CONST. art VIII, § 1.

[12] *Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union*, 2012 UT 75, ¶ 20, 289 P.3d 582; *see also* UTAH CONST. art V, § 1 (stating that the "powers of the government of the State of Utah shall be divided into three distinct departments," and that "no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others").

[13] *Carlton v. Brown*, 2014 UT 6, ¶ 29, 323 P.3d 571 (emphasis added) (quoting *Salt Lake City v. Ohms*, 881 P.2d 844, 849 (Utah 1994)).

adverse parties, the courts are without jurisdiction."[14] Stated differently, "judicial power" in Utah has traditionally been limited to the adjudication of disputes, and where no dispute between opposing parties exists, the court is without jurisdiction. Because no dispute between opposing parties is present here, we normally would dismiss this case for lack of jurisdiction.

¶13 But while the gestational agreement statute certainly does not fit the traditional principles of the "judicial power"—in that it precludes a controversy between adverse parties—adversariness does not completely define the scope of our constitutional power. Certain functions that our courts perform may be both entirely non-adversarial and still appropriately fall within the "judicial power," by virtue of the fact that these functions were intended by the framers of our constitution to be included in the constitutional grant to the judiciary. We believe that the validation of gestational agreements fits within this category because the founders intended adoption—or more specifically, the termination or creation of parental rights—to be a substantive category over which Utah courts had historical power to preside, notwithstanding the absence of a controversy between adverse parties.

¶14 A review of the history of Utah adoption statutes around the time of the framing reveals that early adoption proceedings, like gestational agreement proceedings today, generally required the joint consent of both the adoptive parents and the biological parents before a court could create a legally enforceable adoption. In 1884, a law was passed in the Utah Territory that allowed for the adoption of children through the mutual consent of the parties involved. It provided that the original parents or guardians "may make a statement in writing before the probate judge of the county . . . that he, she or they, voluntarily relinquish all right to the custody of, and power and control over such child."[15] Additionally, "the person desiring to adopt such child" had to make a written statement that "he or she freely and voluntarily adopt[ed] such child . . . with such limitations and conditions as shall be agreed upon by the parties."[16] The probate judge was then required to hold a hearing and "render a

---

[14] *Id.* (quoting *Williams v. Univ. of Utah*, 626 P.2d 500, 503 (Utah 1981)).

[15] 1884 Utah Laws 52.

[16] *Id.*

decree . . . in accordance with the conditions and stipulations of [the parties' agreement]," unless the judge found that "such proceedings are not for the best interest of the child."[17] In this territorial regime, courts were apparently expected to preside over a non-adversarial hearing, and make a judgment in the face of—and independent of—an agreement brought to it by the parties. Thus, before the Utah Constitution was adopted, courts apparently had power to preside over non-adversarial adoption proceedings.

¶15 Similarly, in 1898, shortly after the Utah Constitution was adopted, the Utah legislature codified a new adoption statute establishing a non-adversarial statutory scheme for adoption cases. The statute provided that

> [t]he person adopting a child and the child adopted and the other persons whose consent is necessary, must appear before the judge of the district court of the county where the person adopting resides, and the necessary consent must thereupon be signed and *an agreement be executed* by the person adopting to the effect that the child shall be adopted and treated in all respects as his own lawful child.[18]

The judge was then required to "examine all persons appearing before him . . . and if satisfied that the interests of the child will be promoted by the adoption, [was required to] make out an order declaring that the child shall thenceforth be regarded and treated in all respects as the child of the person adopting."[19] Like the territorial regime, this statute required a judge's approval of a mutually-consented adoption agreement in order for an adoption to be legally binding; no adverse party was contemplated.

¶16 Both the 1884 and 1898 statutes suggest that the founders of the Utah Constitution likely intended the grant of "judicial power" to include, in addition to the power to hear and decide controversies between adverse parties, the substantive power over the termination and creation of parental rights in non-adversarial matters. These statutes show that both shortly before and directly after the adoption of the Utah Constitution, Utah courts frequently presided over

---

[17] *Id.* at 53.

[18] REVISED STATUTES OF UTAH, tit. 1, § 6 (1898) (emphasis added).

[19] *Id.* § 7.

non-adversarial hearings involving the termination or creation of parental rights. These statutes also show that the courts had sufficient power to participate in proceedings that lacked a dispute between opposing parties. Given the prevalence of this historic function of the court, the founders more than likely understood the "judicial power" grant provided in our constitution to include the power to hear such non-adversarial proceedings. Thus, we cannot say, at least with respect to the termination and creation of parental rights, that such non-adversarial proceedings are outside the scope of our "judicial power." Rather, the judicial power includes the power to hear non-adversarial proceedings when these proceedings involve parental rights.

¶17 Here, the validation of gestational agreements falls within our courts' power over the creation and termination of parental rights. Like adoption proceedings, the validation of a gestational agreement effects a change in parental rights. If a gestational agreement is not validated as set out in Utah Code section 78B-15-803, then "the parent-child relationship is determined as provided in [Utah Code sections 78B-15-201 through 204],"[20] which provides that the woman who gave birth to the child, i.e., the gestational mother, shall be considered the mother and the parent of the child.[21] But with a valid gestational agreement, the intended parents can require the court to issue an order that "confirm[s] that the intended parents are the parents of the child" after the birth of the child.[22] Thus, the gestational agreement statute both creates and terminates parental rights.

¶18 Because the validation of a gestational agreement involves the termination and creation of parental rights—a substantive power intended to be included in the constitutional grant of judicial power to the courts—it is appropriate for our courts to participate in their validation, despite the lack of adversariness in gestational agreement proceedings.[23] We therefore hold that the traditional principle of

---

[20] UTAH CODE § 78B-15-809(2).

[21] *Id.* § 78B-15-201(1).

[22] *Id.* § 78B-15-807(1)(a).

[23] We do not consider at this time whether the founders contemplated additional non-adversarial functions of the court, beyond the termination and creation of parental rights, to be

(Continued)

adversariness in our justiciability jurisprudence does not apply to the creation and termination of parental rights.[24] Accordingly, we have authority to hear Petitioners' non-adversarial case on certification from the court of appeals, pursuant to Utah Code section 78A-3-102(3)(b).

## II. The Legislature Intended "Mother" to Mean "Female Parent" in Utah Code Section 78B-15-803

¶19 "When interpreting a statute, it is axiomatic that this court's primary goal is to give effect to the legislature's intent in light of the purpose that the statute was meant to achieve."[25] It is well established that "the best evidence of the legislature's intent is 'the plain language of the statute itself.'"[26] Therefore, "we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning," and "we presume[] that the expression of one [term] should be interpreted as the exclusion of another."[27]

¶20 On that basis, we assume, "absent a contrary indication," that the use of the word "mother" within Utah Code section 78B-15-803 was used "advisedly," and to the exclusion of other words, like "father" or "parent." Because the plain and

_____

included in the "judicial power" grant, as this question is not before our court today.

[24] We have conducted our justiciability analysis under the framework established in our caselaw. In his concurring opinion, Justice Pearce concurs in our result, but he also suggests that in a future case we may wish to revisit the way in which we analyze the scope of the judicial power, and he sets forth a proposed framework for conducting such an analysis. Because it is unnecessary for us to do so to resolve the case before us, we take no position on Justice Pearce's arguments.

[25] *Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 11, 368 P.3d 846 (citation omitted) (internal quotation marks omitted).

[26] *State v. Miller*, 2008 UT 61, ¶ 18, 193 P.3d 92 (citation omitted).

[27] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (alterations in original) (citations omitted) (internal quotation marks omitted).

ordinary meaning of the word "mother" is "female parent,"[28] we are bound, as the district court concluded it was, to read the statute as requiring that one of the intended parents be a female parent.[29]

¶21  Petitioners and the State argue, however, that there exists an express codified indication that the legislature did not necessarily intend to restrict the word "mother" to mean only a female parent. They point to the Utah Code section 68-3-12, which provides the following specific instructions for construing terms that are phrased in only one gender or phrased in singular terms: "unless the construction would be . . . inconsistent with the manifest intent of the Legislature; or . . . repugnant to the context of the statute," a word used in "[t]he singular includes the plural, and the plural includes the singular" and "[a] word used in one gender includes the other gender."[30] The State urges us to apply the latter rule of construction and read the word "mother" as including the "other gender," so that, in effect, "mother" means "parent." To do so, as noted above, we would need to depart from the plain meaning of the word "mother."

¶22  The State correctly notes that there is a direct statutory indication that words in one gender should be construed to include the other. But, as noted in the statute itself, we apply these statutory rules of construction only when they would not be "inconsistent with the manifest intent of the Legislature" or "repugnant to the context of the statute."[31] Here, applying the State's interpretation of "mother" as including the "other gender" contradicts the legislative intent as evidenced in the plain language of the Act and is repugnant to the context of the statute.

---

[28] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1474 (2002); *see also mother*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A *woman* who has given birth to, provided the egg for, or legally adopted a child." (emphasis added)).

[29] Petitioners do not dispute that the word "mother" was intended to denote a gender-specific connotation. Rather, Petitioners note that the "statute was . . . written with gender specific language," and that the term "Intended Mother" was used advisedly to the exclusion of "Intended Parent" or "Intended Father."

[30] UTAH CODE § 68-3-12(1).

[31] *Id.*

¶23 Under the State's proposed reading, the statute would provide that a court could validate a gestational agreement where "medical evidence shows that the intended ~~mother~~ parent is unable to bear a child." Under such a construction, an opposite-sex couple could obtain court validation merely by demonstrating that an intended father—who is an "intended parent"—is incapable of bearing a child. Because every opposite-sex couple could make this showing automatically (every opposite-sex couple contains a male member and obviously a male cannot bear a child), this interpretation would write the intended mother requirement out of the statute.[32] It would therefore be "inconsistent with the manifest intent of the Legislature" and "repugnant to the context of the statute" to read "mother" to mean "parent."

¶24 Even were we to employ both codified rules of construction noted above—first, that the word "mother" be construed to include the other gender, and second, that the singular be construed to include the plural—the problem remains. Under this approach, we would construe the statute to mean that Petitioners must demonstrate that "medical evidence shows that the intended ~~mother is~~ parents are unable to bear a child or ~~is~~ are unable to do so without unreasonable risk to ~~her~~their physical or mental health or to the unborn child." Unlike the State's proposed reading, this interpretation does not allow one intended parent's inability to bear a child to permit the district court to validate a gestational agreement. Instead, such reading would require that the intended parents *as a unit* be incapable of safely bearing a child. While this interpretation does not eviscerate the intended mother requirement of section 78B-15-803(2)(b) in the same way as the State's proposed reading, it nevertheless contradicts the plain language of the statute, which clearly limits the meaning of the word "mother" to female parent.

¶25 It is well established that "terms of a statute are to be interpreted as a comprehensive whole and not in a piecemeal

---

[32] *See Monarrez*, 2016 UT 10, ¶ 11 ("[W]e avoid '[a]ny interpretation which renders parts or words in a statute inoperative or superfluous' . . . ." (second alteration in original) (citation omitted)).

fashion."[33] So a "proposed interpretation that is plausible in isolation may . . . 'lose[] its persuasive effect when we [seek to] harmonize [it] with the rest of' the statutory scheme."[34] That is precisely the case here.

¶26 An examination of a few additional provisions within the Act makes clear that a gender-neutral interpretation of the gestational agreement provisions is untenable. Section 78B-15-102, the "Definitions" section of the Act, clearly illustrates that the legislature intended the term "mother" to have a distinct and separate meaning from the word "father." While the Act fails to define "mother" or "father" expressly, other definitions in section 102 indicate the word "mother" was intended to be tied to the female gender. For example, the legislature expressly linked "mother" to "woman" in its definition of "Gestational mother": "'Gestational mother' means an adult *woman* who gives birth to a child under a gestational agreement."[35] Additionally, the legislature repeatedly linked "father" to the male gender. For example, "Adjudicated father" is defined as "a *man* who has been adjudicated by a tribunal to be the *father* of a child,"[36] "Alleged father" is defined as "a *man* who alleges *himself* to be, or is alleged to be, the genetic *father* or a possible genetic *father* of a child,"[37] and "Declarant father" is defined as "a *male* who . . . claims to be the genetic *father* of a child."[38] And, in case there was any confusion as to the term "man" within these definitions, the legislature further stated that "'Man' . . . means a male individual."[39] Thus, it seems clear from the statute's language

---

[33] *Estate of Berkemeir ex rel. Nielsen v. Hartford Ins. Co. of the Midwest*, 2004 UT 104, ¶ 10, 106 P.3d 700 (citation omitted) (internal quotation marks omitted).

[34] *Oliver v. Utah Labor Comm'n*, 2017 UT 39, ¶ 21, 424 P.3d 22 (second, third, and fourth alterations in original) (citation omitted).

[35] UTAH CODE § 78B-15-102(14) (emphasis added).

[36] *Id.* § 78B-15-102(1) (emphases added).

[37] *Id.* § 78B-15-102(2) (emphases added).

[38] *Id.* § 78B-15-102(8) (emphases added); *see also id.* § 78B-15-102(20) ("'Presumed Father' means a *man* who, by operation of law . . . is recognized as the *father* of a child until that status is rebutted or confirmed as set forth in this chapter." (emphases added)).

[39] *Id.* § 78B-15-102(15).

that the legislature understood "mother" to be female-specific and distinct from the male-specific term "father."

¶27 Likewise, the legislature repeatedly associated the term "mother" with the physical act of carrying and giving birth to a child—an act performed exclusively by females. The Act uses the term "birth mother" throughout the statute,[40] while referring to fathers mainly as "alleged fathers," "adjudicated fathers," or "declarant fathers." Similarly, several definitions within section 102 expressly tie motherhood to the act of giving birth. For example, the statute defines "Birth expenses" to include "expenses for the biological *mother* during *her pregnancy and delivery*,"[41] and, as stated above, defines "Gestational *mother*" as "an adult woman *who gives birth to a child* under a gestational agreement."[42] Likewise, the act of giving birth is directly linked to womanhood: the Act states that the term "Donor" does not include "a husband who provides sperm, or a wife who provides eggs," or "a *woman who gives birth to a child*."[43] The word "mother" under the statute, therefore, denotes a gender that is biologically capable of carrying and giving birth to a child, as opposed to one that is not.

¶28 The Act also repeatedly draws a distinct line between "father" and "mother." In its definitional section the Act provides that "'Genetic testing' means an analysis of genetic markers to exclude or identify *a man as the father* or a *woman as the mother* of a child."[44] Similarly, in determining the parent-child relationship, the Act provides that "[t]he *mother*-child relationship is established between a *woman* and a child" while "[t]he *father*-child relationship is established between a *man* and a child."[45] Thus, it is clear that the legislature intended the term "mother" to be read as a female parent, distinct and separate from the word "father," and not as a gender-neutral term.

---

[40] *See, e.g., id.* § 78B-15-302. Also, "Birth Mother" is defined by the statute as "the biological *mother* of a child." *Id.* § 78B-15-102(5) (emphasis added).

[41] *Id.* § 78B-15-102(4) (emphases added).

[42] *Id.* § 78B-15-102(14) (emphases added).

[43] *Id.* § 78B-15-102(10) (emphasis added).

[44] *Id.* § 78B-15-102(13) (emphases added).

[45] *Id.* § 78B-15-201(1), (2) (emphases added).

¶29 Accordingly, reading the term "mother" to mean "father" or "parent," as Petitioners and the State suggest, is "inconsistent with the manifest intent of the Legislature" and "repugnant to the context of the statute."[46] Given the legislature's repeated efforts to distinguish "mother" from "father," we cannot say that the legislature intended "mother" to include "father" or "parent." Thus, the construction statute, by its own terms, precludes us from using those rules here.

¶30 In addition to the clear language of the statute, it seems highly unlikely the legislature intended Petitioners' proposed interpretation, given the legal landscape at the time the law was passed. As noted by the Petitioners, "[t]he statute was . . . written with gender specific language at a time when marriage in Utah could only be between a man and a woman." Section 78B-15-803 was adopted in 2005—ten years before the United States Supreme Court's decision extending the constitutional right to marry to same-sex couples. At the time the law went into effect, Utah's constitutional provision prohibiting same-sex marriage was operative and legally enforceable.[47] The legislature therefore likely did not contemplate a reading of the statute that would allow same-sex couples to enter valid gestational agreements—a benefit the legislature expressly conditioned on marriage.

¶31 Accordingly, the district court was correct in holding the word "mother" under section 78B-15-803 unambiguously refers to woman and that it was bound to apply the statute as written.

### III. The Canon of Constitutional Avoidance is Inapplicable

¶32 Both the Petitioners and the State attempt to bolster their gender-neutral interpretation by citing to this court's canon of constitutional avoidance. The State argues that "[u]nder the constitutional avoidance doctrine, the Court should interpret 'mother' and 'her' in section 78B-15-803 to include 'father' and 'his.'" Such construction, the State suggests, "avoids the serious . . . constitutional questions raised by the district court's alternative construction." But Petitioners and the State jump the gun.

---

[46] *Id.* § 68-3-12(1)(a).

[47] *See* UTAH CONST. art I, § 29(2) (2005) ("No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect.").

¶33  It is true that when faced with multiple reasonable readings of a statute, we construe the statute in a way that avoids doubts as to its constitutionality.[48] We have cautioned, however, that "too-hasty invocation of the canon can easily undermine legislative intent."[49] An appeal to constitutional avoidance is "not an invitation for us to break faith with the statute's text."[50] So even "when we are trying to save a statute from constitutional concerns, we are not at liberty to rewrite the statute."[51]

¶34  Here, Petitioners' and the State's premature invocation of the canon undermines the legislative intent. As noted above, reading "mother" to include the "other gender" would contradict the plain language of the statute and would work to eliminate the intended mother requirement from section 78B-15-803. Such a reading would also contradict the legislature's intent in enacting the gestational agreement portion of the Act—which was to provide opposite-sex married couples the ability to form valid gestational agreements. Accordingly, we are tied to the statute's text and may not rewrite or depart from its language for fear of constitutional concerns. Rather, we are required to confront the constitutionality of the statute head on.

### IV. Utah Code Section 78B-15-803(2)(b) is Unconstitutional Under *Obergefell* and *Pavan*

¶35  Petitioners alternatively argue that the intended mother requirement in section 78B-15-803(2)(b) violates the Utah and federal constitution. The State has failed to oppose Petitioners' constitutional argument despite receiving proper notice, pursuant to rule 25A of the Utah Rules of Appellate Procedure, of Petitioners' intention to challenge the constitutionality of the statute. The State has waived its right to defend the statute's constitutionality. Our review of this issue therefore could stop here. Nevertheless, we choose to fully

---

[48] *Brown v. Cox*, 2017 UT 3, ¶ 15, 387 P.3d 1040 ("[W]e will endeavor to avoid constitutional issues by construing 'a statute as constitutional wherever possible, resolving any reasonable doubt in favor of constitutionality.'" (citation omitted)).

[49] *Utah Dept. of Transp. v. Carlson*, 2014 UT 24, ¶ 24, 332 P.3d 900.

[50] *State v. Garcia*, 2017 UT 53, ¶ 59, 424 P.3d 171.

[51] *Id.*

address Petitioners' constitutional argument in light of the important issues at stake in this case.

¶36 As noted above, section 78B-15-803(2)(b) of the Utah Code effectively conditions the validation of a gestational agreement on at least one of the two intended parents being a female parent. This squarely violates *Obergefell* in that it deprives married same-sex male couples of the ability to obtain a valid gestational agreement—a marital benefit freely provided to opposite-sex couples. Under the statute, married same-sex male couples are treated differently than married opposite-sex couples. Because under *Obergefell* same-sex married couples are constitutionally entitled to the "constellation of benefits that the States have linked to marriage,"[52] we hold the intended mother requirement in Utah Code section 78B-15-803(2)(b) unconstitutional.

¶37 In *Obergefell*, the United States Supreme Court held as follows: "the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty."[53] The Court noted, however, that this right may include not only "symbolic recognition," but also "material benefits to protect and nourish the union."[54]

> States . . . have throughout our history made marriage the basis for an expanding list of governmental rights, benefits, and responsibilities. These aspects of marital status include: taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decisionmaking authority; adoption rights; the rights and benefits of survivors; birth and death certificates; professional ethics rules; campaign finance restrictions; workers' compensation benefits; health insurance; and child custody, support, and visitation rules.[55]

---

[52] *Obergefell v. Hodges*, 135 S. Ct. 2584, 2601 (2015).

[53] *Id.* at 2604.

[54] *Id*. at 2601.

[55] *Id*.

The Court further held that because the "States have contributed to the fundamental character of the marriage right by placing that institution at the center of so many facets of the legal and social order," there should be "no difference between same- and opposite-sex couples with respect to [these rights]."[56]

¶38 While the *Obergefell* Court did not address at length how state laws should be implemented in light of same-sex couples' right to marry, the Court did hold that the Constitution "does not permit the State to bar same-sex couples from marriage on the *same terms* as accorded to couples of the opposite sex."[57] On this basis, the Court invalidated several challenged state laws in *Obergefell* "to the extent they exclude same-sex couples from civil marriage on the same *terms* and *conditions* as opposite-sex couples."[58] Thus, *Obergefell* precluded states from denying same-sex couples "the constellation of benefits that the States have linked to marriage."[59]

¶39 The United States Supreme Court recently affirmed this notion. In *Pavan v. Smith*, the Court reviewed an Arkansas statute that required the name of a mother's male spouse to appear on her child's birth certificate, even when the mother conceived the child by means of artificial insemination through an anonymous sperm donation, but made no such requirement when the mother's spouse was female under the same circumstance.[60] The Arkansas statute therefore allowed officials to omit the name of a married woman's female spouse from her child's birth certificate while at the same time mandating that the name of a married woman's male spouse be placed on the certificate. Two married same-sex couples brought suit seeking a declaration that the state's law violated the Constitution under *Obergefell*.[61] On appeal, a divided Arkansas Supreme Court ultimately sided with the state, holding that the statute did "not run afoul of *Obergefell*" because the state law was centered on the

---

[56] *Id.*

[57] *Id.* at 2607 (emphasis added).

[58] *Id.* at 2605 (emphases added).

[59] *Id.* at 2601.

[60] 137 S. Ct. 2075, 2077 (2017).

[61] *Id.*

biological relationship of the mother or father to the child and not the marital relationship of the husband and wife. [62]

¶40 The United States Supreme Court summarily reversed the Arkansas Supreme Court's decision, holding that the law's "differential treatment infringes on *Obergefell*'s commitment to provide same-sex couples 'the constellation of benefits that the States have linked to marriage.'"[63] The Court made clear that the state chose "to make its birth certificates more than a mere marker of biological relationships."[64] Instead, the "State uses those certificates to give married parents a form of legal recognition that is not available to unmarried parents."[65] Accordingly, the Court held that "Arkansas may not, consistent with *Obergefell*, deny married same-sex couples that recognition."[66]

¶41 *Pavan* affirms *Obergefell*'s mandate that married same-sex couples be afforded the governmental rights and benefits granted to married opposite-sex couples. Under these decisions, states may no longer deny benefits conditioned on the institution of marriage to same-sex couples which are freely granted to couples of the opposite sex. State laws that condone such disparate treatment will be declared "unconstitutional to the extent they treat[] same-sex couples differently from opposite-sex couples."[67] Thus, the Supreme Court has made it abundantly clear that "the Constitution entitles same-sex couples to civil marriage 'on the same terms and conditions as opposite-sex couples.'"[68]

¶42 It is with these terms and conditions that we are concerned today. Accordingly, we must determine whether section 78B-15-803 affords a benefit linked to marriage and whether it permits disparate treatment of certain same-sex marriages.

---

[62] *Smith v. Pavan*, 505 S.W.3d 169, 178 (Ark. 2016), *rev'd per curiam* 137 S. Ct. 2075 (2017).

[63] *Pavan*, 137 S. Ct. at 2077 (quoting *Obergefell*, 135 S. Ct. at 2601).

[64] *Id.* at 2078.

[65] *Id.* at 2078–79.

[66] *Id.* at 2079.

[67] *Id.* at 2078.

[68] *Id.* at 2076 (quoting *Obergefell*, 135 S. Ct. at 2605).

¶43 A valid gestational agreement is undoubtedly a benefit linked to marriage. Obtaining a valid gestational agreement is, in many cases, one of the most important benefits afforded to couples who may not be medically capable of having a biological child. Such an agreement works to secure parental rights to an unborn child and bestows rights and benefits upon the intended parents. The State has explicitly conditioned this benefit on a petitioner's marital status; no unmarried couple may obtain one.[69] It is therefore unquestionably linked to marriage.

¶44 Application of section 78B-15-803(2)(b) results in disparate treatment of similarly situated same-sex male marriages. The statute requires that medical evidence be presented to the court, showing that the intended mother is medically incapable of bearing a child or to do so would otherwise harm her or the child. It is impossible for married same-sex male couples to meet this requirement since neither member is a "mother" under the statute. Requiring one of the two intended parents to be female precludes married same-sex male couples from entering into a valid gestational agreement[70]—a benefit explicitly conditioned on marriage. The statute therefore treats married same-sex male couples differently than married opposite-sex couples. Under *Obergefell* and *Pavan*, the Constitution proscribes such disparate treatment.

¶45 Under these cases, married same-sex couples, whether male or female, are entitled under the Constitution to the same terms and conditions as married opposite-sex couples.[71] In other words,

_____

[69] UTAH CODE § 78B-15-801(3) ("The intended parents shall be married, and both spouses must be parties to the gestational agreement.").

[70] *See id.* § 78B-15-801(4) ("A gestational agreement is enforceable only if validated as provided in Section 78B-15-803.").

[71] Because the Supreme Court's decisions in *Obergefell* and *Pavan* make clear that section 78B-15-803(2)(b) violates the U.S. Constitution, we need not address Petitioners' constitutional argument under the Uniform Operation of Law clause of the Utah Constitution. *See State v. Briggs*, 2008 UT 83, ¶ 26, 199 P.3d 935 ("[T]he protections in the federal Constitution provide a constitutional floor . . . . [I]f the challenged state action violates the federal Constitution, we need not reach the question of whether the

(Continued)

same-sex couples must be afforded all of the benefits the State has linked to marriage and freely grants to opposite-sex couples. Because Utah Code section 78B-15-803(2)(b) works to deny certain same-sex couples a marital benefit freely accorded to opposite-sex couples, it is unconstitutional under *Obergefell* and *Pavan*.

V. Utah Code Section 78B-15-803(2)(b) is Severable From the Act

¶46 Having concluded that section 78B-15-803(2)(b) of the Utah Code is unconstitutional, we must now determine whether that subsection is severable from the rest of the Act.

¶47 Petitioners argue that the intended mother requirement is severable from the remainder of the statute and so the court may "still allow the remaining portion of the statute to remain in effect." The State did not address the constitutional question in its amicus brief and therefore made no representation as to the severability of the statute.

¶48 "When ruling on the constitutionality of a statute, 'the general rule is that statutes, where possible, are to be construed so as to sustain their constitutionality. Accordingly, if a portion of the statute might be saved by severing the part that is unconstitutional, such should be done.'"[72]

¶49 In determining the severability of an unconstitutional subsection, "we look to legislative intent."[73] When no express legislative intent is present within the statute, "we 'turn to the statute itself, and examine the remaining constitutional portion of the statute in relation to the stricken portion.'"[74] We review "the statute as a whole and its operation absent the offending subsection," and if "the remainder of the statute is operable and still furthers the intended legislative purpose, the statute will be allowed to stand."[75]

---

Utah Constitution provides additional protection; we may instead resolve the case with reference only to the federal Constitution.").

[72] *See State v. Briggs*, 2008 UT 83, ¶ 47, 199 P.3d 935 (citation omitted).

[73] *State v. Lopes*, 1999 UT 24, ¶ 19, 980 P.2d 191.

[74] *Gallivan v. Walker*, 2002 UT 89, ¶ 88, 54 P.3d 1069 (citation omitted).

[75] *Id.* (citation omitted) (internal quotation marks omitted).

In other words, we look at "whether the remaining portions of the act can stand alone and serve a legitimate legislative purpose."[76]

¶50 The legislature did not include a severability provision or any other express indication of its legislative intent regarding unconstitutional provisions within the Act itself. So we must determine whether the statute is operable and furthers a legitimate legislative purpose absent that provision.[77]

¶51 Section 78B-15-803 remains operative even absent the intended mother requirement. Section 803(2) requires the district court to make eleven findings in order to validate a gestational agreement. One of these is the unconstitutional intended mother requirement. The other findings are that: (1) residency requirements have been satisfied; (2) a home study has been conducted of the intended parents and the intended parents meet the standards of fitness applicable to adoptive parents; (3) all parties have participated in professional counseling where they discussed different options and consequences of the agreement; (4) all parties have voluntarily entered into the agreement and understand its terms; (5) the prospective gestational mother has had a successful pregnancy in the past and neither she nor the new child will be harmed by her carrying a new child; (6) all parties are at least 21 years old; (7) an adequate provision has been made for health-care expenses in the agreement; (8) consideration paid to the prospective gestational mother is reasonable; and (9) neither the prospective gestational mother's eggs, nor (10) her husband's sperm, are being used in the assisted reproduction procedure.[78] Striking the intended mother requirement from this list does not reduce the significance of these other required findings. The district court should still be required to make findings on each of the additional ten conditions. Severing the intended mother requirement from the statute does nothing to affect the operability of the remaining portions of the statute.

¶52 We next turn to whether the legitimate purpose of the statute is still furthered even without the intended mother requirement. We hold that it is. Both Petitioners and the State argue that the purpose of the statute is to permit married couples to enter

---

[76] *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 686 (Utah 1985).

[77] *See Gallivan*, 2002 UT 89, ¶¶ 88–89.

[78] *See* UTAH CODE § 78B-15-803(2)(a)–(k).

into gestational agreements where the couple is medically incapable of bearing children on their own. While this is certainly one of its purposes, it is not the sole purpose of the statute. Viewing section 78B-15-803 as a whole, additional purposes of the statute include protecting the well-being of the unborn child and ensuring that the parties have adequately considered the consequences of their arrangement before entering into a legally enforceable gestational agreement. Excising the intended mother provision does not undermine these purposes.

¶53 As noted above, the legislature made a list of eleven findings that must be satisfied before an agreement will be deemed enforceable. These include findings on the fitness of the intended parents to raise a child, the health of the prospective gestational mother, the likelihood that the prospective mother will successfully give birth to the child without harming the child, the clarity of the agreement, and the parties' understanding of their arrangement. These findings illustrate that the legislature was at least equally concerned with the well-being of the unborn child and the parties' ability to comprehend the effect of the agreement. Removal of the intended mother requirement does not undermine the ability of a district court to determine whether the prospective gestational mother can safely carry a child, whether the intended parents are fit to raise the child, and whether the parties have carefully considered their decision to enter the agreement. Thus, the district court will serve to ensure that the unborn child is protected and that the parties' carefully considered the effects of the agreement—both intended purposes of the statute.

¶54 Therefore, the intended mother requirement set forth in section 78B-15-803(2)(b) is severable because the remainder of the statute will continue to be operable and continue to serve a legitimate purpose after the unconstitutional intended mother requirement is excised. We therefore remand this case for further proceedings consistent with this opinion.

**Conclusion**

¶55 Under a plain reading of the statute, a gestational agreement is unenforceable unless at least one of the intended parents is female. This requirement precludes married same-sex male couples from obtaining a valid agreement. As required by *Obergefell* and *Pavan*, we hold that section 78B-15-803(2)(b) is unconstitutional under the Fourteenth Amendment's Equal Protection and Due Process Clauses. Additionally, we hold that the intended mother requirement of

section 78B-15-803(2)(b) is severable from the remainder of the Act. We accordingly reverse and remand for further proceedings consistent with this opinion.

———————

JUSTICE PEARCE, concurring:

¶56 I concur in the result the majority reaches, including the majority's conclusion that our judiciary may constitutionally review and validate gestational agreements under the statutory framework at issue here. I write separately, however, to highlight jurisdictional and separation of powers questions implicated in this case, particularly given the language the majority uses when addressing the issue of jurisdiction. In its discussion, the majority examines the "judicial power of the state" conferred on our judiciary by the Utah Constitution, and references two "constitutional" limits on the scope of that power and the exercise thereof. *Supra* ¶ 12 (citation omitted). Because I question if we have ever squarely confronted whether those limits are constitutional requisites, I raise the issues for possible exploration in future cases.

¶57 First, the majority suggests that the judicial power constitutionally vested in our courts contains a general requirement of "adversariness." *Supra* ¶ 12. The majority asserts that "'judicial power' in Utah has traditionally been limited to the adjudication of disputes, and where no dispute between opposing parties exists, the court is without jurisdiction." *Supra* ¶ 12. In support, the majority recites language from our prior opinions that I find to be potentially problematic when utilized in this context, specifically, the statements "judicial power . . . is *generally understood* to be the power to hear and determine controversies between adverse parties," *supra* ¶ 12 (alteration in original) (emphasis added to "generally understood") (emphasis omitted from "controversies between adverse parties") (quoting *Carlton v. Brown*, 2014 UT 6, ¶ 29, 323 P.3d 571), and "in 'the absence of any justiciable controversy between adverse parties, the courts are without jurisdiction,'" *supra* ¶ 12 (quoting *Carlton*, 2014 UT 6, ¶ 29). Applying this language, the majority opines that "lack of adversariness" would "[o]rdinarily . . . raise constitutional questions of justiciability." *Supra* ¶ 12.

¶58 I worry that we risk equating statements regarding a "general understanding" of our judicial power, *see supra* ¶ 12, with a

rule regarding what *must* exist before we can exercise that power.[79] Likewise, we should not reflexively equate justiciability principles or statements regarding our jurisdictional authority with our constitutional "judicial power." We often use the term "jurisdiction" when discussing our authority to entertain a dispute under rules of our own making. *See State v. Lara*, 2005 UT 70, ¶ 12, 124 P.3d 243. Thus, a statement that we are "without jurisdiction" in a particular circumstance does not establish a lack of constitutional authority, but invites inquiry as to the source of the jurisdictional limit.

¶59 For example, in *Gregory v. Shurtleff*, we suggested that our standing jurisprudence reflects "'judge-made'" rules regarding our exercise of jurisdiction. 2013 UT 18, ¶ 16 & n.10, 299 P.3d 1098 (quoting 59 AM. JUR. 2D *Parties* § 30 (2d ed. 2012) ("Standing in the state courts is a judge-made doctrine . . . .")); *see also id.* ¶ 12 n.4 (noting that although separation of powers concerns support certain standing requirements, "these concerns do not reflect an absolute, constitutionally[]imposed jurisdictional requirement, but rather a historical and pragmatic conviction that particular disputes are most amenable to resolution in particular forums" (citation omitted) (internal quotation marks omitted)). Thus, while we have described standing as "rais[ing] fundamental questions regarding [our] basic authority over [a] dispute," *Alpine Homes, Inc. v. City of W. Jordan*, 2017 UT 45, ¶ 2, 424 P.3d 95 (citation omitted), it is not necessarily a constitutional limit on our judicial power, *cf. United States v. Windsor*, 570 U.S. 744, 757 (2013) (noting that "[r]ules of prudential standing, by contrast [to Article III requirements], are more flexible rule[s] . . . of federal appellate practice" (third and fourth alterations in original) (citation omitted) (internal quotation marks omitted)).

---

[79] In addition, we should exercise caution to ensure that we are not inadvertently converting a general description of the judiciary's role, created in another context for another purpose, into a constitutional limit on our authority. For example, a single-sentence summation of the judiciary's role for purposes of a separation of powers analysis, *see, e.g., In re Handley's Estate*, 49 P. 829, 830 (Utah 1897), hardly tells us the full range of judicial power or the breadth of courts' subject matter jurisdiction. Moreover, a general statement regarding the judiciary's core, prevalent, or traditional responsibilities, *see, e.g., Carlton v. Brown*, 2014 UT 6, ¶ 29, 323 P.3d 571; *Salt Lake City v. Ohms*, 881 P.2d 844, 849 (Utah 1994), does not, without more, readily translate into an affirmative constitutional requirement.

¶60 It appears that we have never examined whether the Utah Constitution requires adversity between parties as a jurisdictional prerequisite. The language the majority relies upon for this proposition entered our jurisprudence in *Citizens' Club v. Welling*, 27 P.2d 23 (Utah 1933). *Welling* addressed whether the power to "hear and determine" factual matters, and to apply the law thereto, is an exclusively judicial function. *Id.* at 26. At issue was a statute authorizing the Secretary of State to revoke the charter of a social club if the club permitted gambling. *Id.* at 23. The Citizens' Club challenged the statute, arguing that it impermissibly delegated judicial power to the Secretary. *Id.*

¶61 Rejecting that challenge, we reasoned that while "[t]he term 'judicial power of courts' is generally understood to be the power to hear and determine controversies between adverse parties and questions in litigation," *id.* at 26, the broader power to "hear and determine" evidence, facts and legal questions is not "exclusively" or "necessarily" judicial, *id.* at 25; *see also id.* at 26 (characterizing this view as "sustained by the weight of judicial authority"). In so holding, we did not consider our general understanding of judicial power as a limitation on judicial authority, but addressed whether judicial decision-making authority, described more broadly, may also be exercised by other branches of government. *See id.* at 26; *id.* at 24 (noting the parties' agreement that "the term 'judicial power' as employed in the Constitution is not capable of precise definition"); *id.* at 26 ("Merely to say that judicial power is 'a power to hear and determine' is not decisive . . . . [A]dministrative and executive officers often are required to hear and determine many facts upon which their action is based but which is not judicial in the sense that it belongs *exclusively* to the courts." (emphasis added)). The question of whether judicial power might be exercised in a nonadversarial proceeding was not before us. Our statement regarding our general understanding of judicial power was not commentary or even dicta directed to that issue, much less a statement definitively resolving the question.

¶62 We have quoted *Welling*'s language a number of times since, usually in separation of powers contexts. *See, e.g.*, *Judd v. Drezga*, 2004 UT 91, ¶ 37, 103 P.3d 135; *Salt Lake City v. Ohms*, 881 P.2d 844, 849 (Utah 1994); *Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984). But we have never employed that language as defining the scope of our judicial power as it relates to nonadversarial proceedings. This court has not previously examined whether the Utah Constitution requires

adversity between parties before we can properly exercise jurisdiction. Indeed, the separation of powers issues raised in *Judd*, *Ohms*, and *Timpanogos Planning & Water* had nothing to do with whether adversariness is a jurisdictional requirement. And because there were adverse parties in those cases, there was no need for us to determine whether adversity was a constitutional requisite. Thus, by adopting the premise that the Utah Constitution generally requires adverse parties before a court may exercise jurisdiction, and viewing our courts' historical jurisdiction over non-adverse adoption cases as an exception to that general rule, the majority's analysis may distort the way we view our judicial power in future cases.

¶63 While Utah courts most often resolve disputes between adverse parties, Utah courts have also historically presided over nonadversarial proceedings. Indeed, at the time of statehood, the courts oversaw many proceedings that had the potential to lack adverse parties, including adoptions, name changes, probate, and guardianship matters. *See supra* ¶ 14 (concluding that "before the Utah Constitution was adopted, courts apparently had power to preside over non-adversarial adoption proceedings" (citing 1884 Utah Laws 52–53)); *supra* ¶ 15 (concluding that "shortly after the Utah Constitution was adopted, the Utah legislature codified a new adoption statute establishing a non-adversarial statutory scheme for adoption cases" (citing UTAH REV. STAT. § 6 (1898))); *see also, e.g.*, II UTAH COMP. LAWS § 4016 (1888) ("If no person, within one year after the probate of a will, contested the same or the validity thereof, the probate of the will is conclusive, saving to infants and persons of unsound mind, a like period of one year after their respective disabilities are removed."); *id.* § 4305 ("The probate court of each county . . . may appoint guardians . . . of minors . . . . Such appointment may be made on the petition of a relative or other person on behalf of the minor, or on the petition of the minor, if fourteen years of age."); UTAH REV. STAT. § 1546 (1898) (providing that after a petitioner seeking a name change fulfills the statutory requirements, "the district court may order the change of name as requested, upon proof in open court . . . that there exists proper cause for granting the same, and that . . . notice of the hearing thereof has been given").

¶64 And we continue to exercise jurisdiction in these types of proceedings. Thus, our dockets reflect several examples of matters that routinely lack adverse parties. Yet this court has, as noted above, occasionally spoken in absolute terms when remarking on the adversariness usually present in judicial proceedings. *See, e.g., Univ. of Utah v. Indus. Comm'n of Utah*, 64 Utah 273, 229 P. 1103, 1104 (1924)

("Even courts of general jurisdiction have no power to decide abstract questions or to render declaratory judgments, in the absence of an actual controversy directly involving rights."). But those statements do not reflect the reality of judicial practice either currently or at the time of statehood.

¶65 The question, then, is whether we should equate our court's language regarding a "general understanding" of our judicial power with a "longstanding limitation" on its exercise, *see infra* ¶ 126 (Lee, A.C.J., concurring), absent a prior holding that such a limit exists. Without further inquiry, I am not prepared to do so. When reciting general principles, we may fail to acknowledge the full scope of our judicial power or the nuances that attend its application. I am concerned that, here, the majority may be converting that failure into a jurisdictional bar. Broad language, inconsistent with current or historical practice, should not be read so literally.

¶66 I am, of course, familiar with federal case law suggesting the need for adversity as a hallmark of the federal constitution's "case and controversy" clause. *See, e.g.*, *Deposit Guar. Nat. Bank, Jackson v. Roper*, 445 U.S. 326, 348 (1980) ("Art. III asks but a single question: Is there a continuing controversy between adverse parties who retain the requisite stake in the outcome of the action?"); *Richardson v. Ramirez,* 418 U.S. 24, 36 (1974) (explaining that federal courts "are limited by the case-or-controversy requirement of Art. III to adjudication of actual disputes between adverse parties"). But the United States Supreme Court has clarified that "prudential considerations," rather than constitutional language, underlie the Court's "insist[ence] upon 'that *concrete adverseness* which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Windsor*, 570 U.S. at 760 (emphasis added) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Moreover, even if federal constitutional law were to impose a strict adversariness standard, *see Windsor*, 369 U.S. at 785 (Scalia, J., dissenting), our understanding of federal law should not unduly color our analysis in this instance—both because the constitutional language and principles are different and because any federal adversariness requirement may be inconsistent with historical federal practice.

¶67 "Unlike the federal system, the judicial power of the state of Utah is not constitutionally restricted by the language of Article III of the United States Constitution requiring 'cases' and 'controversies,' since no similar requirement exists in the Utah Constitution." *Jenkins v. Swan*, 675 P.2d 1145, 1149 (Utah 1983). Thus, like "[n]umerous

other states," we are "mindful that [our] constitution[] do[es] not impose the same restrictions on [our] judicial power that the federal constitution imposes on federal courts." *Gregory*, 2013 UT 18, ¶ 16. Accordingly, before determining that an element of federal justiciability applies as a matter of Utah constitutional law, we examine whether there is "support in either the text of the [Utah] Constitution or in [Utah] jurisprudence" for recognizing the standard "as a constitutional requirement" or "adopting the federal . . . doctrine." *See id.* ¶ 17 (citation omitted); *see also, e.g., State v. Tulley,* 2018 UT 35, ¶ 80, 428 P.3d. 1005 ("When asking this court to interpret constitutional language, a party should analyze the plain meaning of the constitutional text, our prior case law, the interpretation other courts have given to similarly worded provisions in their state constitutions, and what lessons might be gleaned from the historical context." (citation omitted) (internal quotation marks omitted)). With respect to adversity between parties, we have not yet undertaken this analysis.

¶68 While federal law often proves a helpful resource when interpreting the Utah Constitution, federal law regarding adversariness may prove of limited utility. Historically, federal courts presided over a number of proceedings that did not require adverse parties. *See* James E. Pfander, *Standing, Litigable Interests, and Article III's Case-or-Controversy Requirement*, 65 UCLA L. REV. 170, 175 (2018) (noting that, in our nation's early years, Congress assigned a number of noncontentious matters to the federal courts). For example, in the eighteenth and nineteenth centuries, federal courts oversaw prize and salvage petitions to establish title to intercepted merchant ships and naval vessels of opposing nations, which often proceeded uncontested, without the appearance of an adverse party. James E. Pfander & Daniel D. Birk, *Article III Judicial Power, the Adverse-Party Requirement, and Non-Contentious Jurisdiction*, 124 YALE L. J. 1346, 1368–69 (2015). In addition, early naturalization proceedings did not require a party to name an opposing party. *See* An Act to Establish an Uniform Rule of Naturalization, 1 STAT. 414, 414–15 (1795). The Supreme Court nevertheless upheld federal court jurisdiction over those proceedings, noting that "[t]he function of admitting to citizenship has been conferred exclusively upon courts continuously since the foundation of our government." *Tutun v. United States*, 270 U.S. 568, 576 (1926).

¶69 In his separate opinion, Justice Lee suggests a different historical narrative, asserting that early American jurisprudence and Utah legal proceedings reflected a "general requirement of adversariness" that is "rooted deeply in our law," *infra* ¶¶ 106–12,

upon which "our entire branch of government is built," *infra* ¶ 136. He thus posits that "the traditional understanding of the judicial power . . . carries a requirement of adversariness even without an express 'case and controversy' clause." *Infra* ¶ 133. But I am not presently convinced that the "traditional understanding" of the judicial power is completely iron-clad when it comes to adversariness. The historical evidence, even if conflicting, demonstrates that the origin of the adverse party requirement is worthy of additional briefing and analysis if it is to be used to inform our understanding of our state constitution.[80]

¶70 Accordingly, I question whether the adversity that so often exists in judicial proceedings is constitutionally required. Justice Lee suggests it is and attempts to explain away Utah courts' involvement in numerous nonadversarial proceedings as exceptions to the general rule. But I am not persuaded that Justice Lee offers a definitive answer. Even if Justice Lee is correct that some proceedings can be explained as actions that resemble *in rem* proceedings and are "inherently" or "functionally" adversarial, *infra* ¶¶ 125, 130, that explanation fails to account for the broader range of nonadversarial proceedings over which Utah courts have historically presided. And as Justice Lee acknowledges, defining a fully explanatory exception to an adversariness rule may prove a difficult task. *See infra* ¶ 126 ("The name change example cited by Justice Pearce may be harder to reconcile. And I suspect there may be other examples of single-party actions that have been filed in our courts." (citation omitted)).

¶71 Although we are not required to resolve this issue to decide this case, the time may come when we will need to wrestle with the question. My aim in writing separately is to highlight that the cases

---

[80] Although I question whether adversity is constitutionally required, I don't doubt the substantial benefits of an adverse party requirement. As Justice Kennedy explained in *Windsor*, adversity "sharpens the presentation of issues upon which the court so largely depends for illumination." *Windsor*, 570 U.S. at 760 (citation omitted); *see also State v. Houston*, 2015 UT 40, ¶ 65 & n.135, 353 P.3d 55 (plurality opinion) (compiling cases noting the court's reluctance to resolve matters without the benefit of adversarial briefing). Thus, even if we were eventually to conclude that adversity is not constitutionally required, adversity would nonetheless remain the general rule as a prudential matter.

the majority cites have not done the heavy lifting needed to decide whether the Utah Constitution premises our jurisdiction on the presence of adverse parties. When that question is squarely presented, this court will need to do much more than recite the general statements regarding this court's authority on which the majority relies.

¶72 My second concern centers on the majority's statement that "we are constitutionally limited to wield only judicial power." *Supra* ¶ 12 (citation omitted) (internal quotation marks omitted). Because the majority ultimately concludes that a court exercises judicial power when it reviews and approves a gestational agreement under the statutory framework at issue here, we have no need to confront this separation of powers principle in this case. I raise the issue, however, because the Utah Constitution[81] and our precedent suggests that the legislative, executive, and judicial branches of government may be tasked with responsibilities not plainly within their respective spheres, so long as those responsibilities do not unconstitutionally infringe on another branch's duties.

¶73 I am not writing to express a view on how the constitutional language should be interpreted. Rather, I seek to flag the issue for a case in which it is presented and to advocate for consistency in our interpretation and application of Utah constitutional law.

¶74 The majority first analyzes whether our compliance with the gestational agreement statute involves the exercise of judicial power. In doing so, the majority advises that it "normally would dismiss this case" because courts are "generally" without jurisdiction absent a "justiciable controversy between adverse parties," and "no dispute between opposing parties is present here." *Supra* ¶ 12 (citation omitted) (internal quotation marks omitted). Thus, despite explicit legislative direction that "a tribunal may issue an order validating [a] gestational agreement and declaring that the intended parents will

---

[81] Article V, section 1 of the Utah Constitution provides,

> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

be the parents of a child born during the term of the agreement," UTAH CODE § 78B-15-803, the majority opines that it would ordinarily decline to do so.

¶75  The majority's approach thus raises the question of whether, assuming adversity between parties is generally required to exercise judicial power, the Legislature may authorize or assign to the judicial branch functions not traditionally understood to be encompassed in that power. And it requires us to consider what test we should apply to evaluate the constitutionality of the Legislature's directive. The majority signals that the answer is simple—the judiciary cannot exercise anything other than judicial power, rendering any other analysis unnecessary.[82]

¶76  But we have previously recognized that the three branches of government, acting through their respective officers, may be tasked with or perform duties that fall outside their "core" responsibilities, so long as those tasks do not invade the "exclusive" province of another branch of government. *See In re Young*, 1999 UT 6, ¶¶ 14, 26, 976 P.2d 581. Moreover, we have recognized that some tasks or powers might properly be exercised by more than one branch, and in some circumstances, the Legislature may direct the assignment of those tasks. *See, e.g.*, *Taylor v. Lee*, 226 P.2d 531, 536–38 (Utah 1951) (concluding that "the Legislature could grant to the Governor the right to remove for cause," even "[a]ccepting the proposition that removal from office is a judicial function"); *Welling*, 27 P.2d at 25, 26 (noting agreement with the principle that "while the courts have undoubted power to revoke and annul charters granted to corporations on grounds, among others, of an illegal or wrongful exercise or use of such charters, yet it also is competent for the

---

[82] This presents a different question than we sometimes confront when assessing the limits of our judicial power. This is not a case in which we are ensuring that we are not seizing authority for our branch. Rather, we are examining whether the Utah Constitution forbids courts from performing a task that the people of Utah, through their elective representatives, have asked us to undertake. If nothing else, the presumption of constitutionality we afford legislation should cause us to make sure that we have our history correct before we tell the Legislature that it is coloring outside the constitutional lines.

Legislature to provide for a legislative or administrative forfeiture of the charter as well as for a judicial one").

¶77 Accordingly, when we have reviewed the actions of other branches of government, we have not stated that the Legislature may exercise only legislative power, or that the executive branch may exercise only executive power, but have applied a three-part test asking,

> First, [is the state actor] "charged with the exercise of powers properly belonging to" one of the three branches of government? Second, is the function that the statute has given . . . one "appertaining to" another branch of government? The third and final step in the analysis asks: if the answer to both of the above questions is "yes," does the constitution "expressly" direct or permit exercise of the otherwise forbidden function?

*In re Young*, 1999 UT 6, ¶ 8.

¶78 We have alluded to this type of analysis when applying separation of powers principles to the judiciary. *See, e.g.*, *Gregory*, 2013 UT 18, ¶ 12 n.4 ("In entertaining a claim that the Legislature has violated the constitutional restraints on its lawmaking procedures, [the court] [is] not 'exercis[ing] a function' of either of the other branches of government." (third alteration in original)). This is a much different exercise than the one the majority suggests we would perform. And the existence of competing constitutional inquiries could yield anomalous results.

¶79 Suppose the Legislature created a commission comprised of members of the executive, legislative, and judicial branches, to be appointed by their respective departments. If the commission were challenged on the basis that the power to appoint is an exclusively executive function, we might assess the commission's constitutionality under the *In re Young* test. We would ask whether, in making an appointment, the judicial and legislative branches were fulfilling a function appertaining to another branch, and, if so, whether the Utah Constitution expressly allows the exercise of that function.[83] However, under the approach the majority signals here,

---

[83] The approach the majority employs would ask whether the appointment involved the exercise of judicial power. And Justice Lee would conclude that this is not a question governed by *In re Young*

(Continued)

we would assess the question differently,[84] at least as to the judiciary, asking only whether the power to make appointments falls within the judicial power.

¶80 Moreover, as noted above, our separation of powers jurisprudence does not necessarily support a bright-line test regarding the scope of judicial, legislative, and executive power. We have repeatedly observed that the lines that separate the powers between the branches of government can be, at times, blurry. *See, e.g., In re Young*, 1999 UT 6, ¶ 14 ("[T]here must be powers and functions which may, in appearance, have characteristics of an inherent function of one branch but which may be permissibly exercised by another branch."); *Taylor*, 226 P.2d at 536 ("This court, in a number of cases, has discussed the term 'judicial power' as employed in the Constitution and has dealt with some necessary overlapping of the powers of the three departments."); *Thatcher v.*

---

or even by our constitution's separation of powers clause, but one resolved by asking "whether the judicial branch of government itself has the power to appoint." *Infra* ¶ 147. And that question can be answered by looking at "longstanding practice and a historical understanding of the terms of Article VIII." *Infra* ¶ 147. Justice Lee cites two United States Supreme Court cases in support. *Infra* ¶ 147 n.109. One of those cases concludes, with little constitutional analysis, that Congress could permissibly delegate to the judiciary the ability to appoint election supervisors. *Ex parte Siebold*, 100 U.S. 371, 397–98 (1879). The other addresses a federal statutory question regarding power of removal and, along the way, characterizes a federal court's appointment of a clerk of court as "a purely ministerial function." *In re Hennen*, 38 U.S. 230, 232–33, 236, 239 (1839). None of this is tethered to the question of what the people of Utah would have understood article V to mean. And it serves to highlight that we have yet to conduct any serious originalist inquiry into the meaning of article V of our constitution.

[84] Justice Lee also responds to the hypothetical by noting that "[t]he head of a branch of government like this one has long exercised the power to administer and coordinate the work of that branch." *Infra* ¶ 147. But that line of argument would not help us answer the hypothetical, in which the judiciary is asked to appoint delegates to a body whose purpose reflects the interests of all three branches of government, and thus is not limited to administering and coordinating the judicial branch's work.

*Indus. Comm'n,* 115 Utah 568, 207 P.2d 178, 181 (1949) (reasoning that it would be "fruitless and unwise" to attempt to definitively determine which powers properly belong to or appertain to each branch), *superseded by constitutional amendment on other grounds as recognized in Injured Workers Ass'n of Utah v. State,* 2016 UT 21, 374 P.3d. 14; *Welling,* 27 P.2d at 24 (noting the parties' agreement "that the term 'judicial power' as employed in the Constitution is not capable of precise definition").[85]

¶81 Justice Lee argues that the potential inconsistencies I have highlighted with respect to our separation of powers jurisprudence can be reconciled by reading our constitution and case law as "draw[ing] a distinction between *persons* and *branches*." *Infra* ¶ 149. Justice Lee would read article V's prohibition—that "no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted," UTAH CONST. art. V, § 1—as applying exclusively to *persons. Infra* ¶¶ 142, 144. And we have, in the course of addressing questions concerning the place of administrative agencies in our constitutional framework, appeared to draw a similar line. *See, e.g., Robinson v. State,* 2001 UT 21, ¶ 12, 20 P.3d 396. But this is a matter that we have never fully explored. And we do not appear to have considered the question with reference to what the language of article V, section 1 would have meant to the people of Utah at the time of statehood.

¶82 Justice Lee suggests that, at the time of the constitution's ratification, the people of Utah may have been concerned that a person employed by one branch of government might, in a personal

---

[85] Justice Lee suggests that application of the *In re Young* test to the judiciary would "introduc[e] a circular loop of uncertainty into our assessment of the scope of the power of our three branches of government." *Infra* ¶ 152. I fail to see the circularity in applying the *In re Young* test, not to determine the scope of constitutionally conferred judicial power, as Justice Lee suggests, *see infra* ¶¶ 152–53, but to assess the constitutionality of any assignment to the judiciary of tasks that may fall outside traditional notions of judicial power. That inquiry will be informed by an understanding of the executive, legislative, and judicial branches' respective powers, as Justice Lee recognizes, *see infra* ¶ 118, but that does not render it inherently circular.

capacity, undertake functions appertaining to another. *Infra* ¶¶ 144 & n.107, 150. Before we start definitively interpreting this language, I want to leave open the possibility that the people of Utah had a broader concern—that to preserve the distinctions between our various departments of government, those departments were prohibited from exercising one another's powers. And the language of article V thus bars the departments' employees from doing so, whether acting in their official or unofficial capacities. Rather than attempting to rewrite the constitution's language as Justice Lee charges, *infra* ¶ 151, I am raising the possibility that we have never carefully explored or ascertained this language's original meaning.

¶83 Moreover, it is not apparent how this distinction would make much practical difference. Branches of government act only through the individuals they employ. And while Justice Lee would read article V and *In re Young* as applying solely to the exercise of governmental authority by persons, another reading exists that draws no substantive distinction between the roles individuals may fulfill and the authority their respective departments may exercise. As Justice Lee acknowledges, *infra* ¶ 149, *In re Young* states that unless a power or function "is essential, core, or inherent in the very concept of one of the three branches of a constitutional government[,] . . . the function is not one barred *to other branches*, or to members of those branches," 1999 UT 6, ¶ 26 (emphasis added).

¶84 And the analysis we employed in *In re Young* is littered with references to the functions or powers of the respective "branches" of government. *See, e.g.*, *id.* ¶ 11 ("As noted, the critical constitutional language is 'powers properly belonging to' one branch and 'functions appertaining to' either of the other two."); *id.* ¶ 13 ("It is just this sort of judgment about what is so inherent in a branch that it cannot be exercised by another and what is not so inherent to one that it can be exercised by several that our cases have striven to determine over the years."); *id.* ¶ 14 ("A necessary corollary to the doctrine that some powers or functions belong exclusively to the members of one branch is that there must be powers and functions which may, in appearance, have characteristics of an inherent function of one branch but which may be permissibly exercised by another branch."); *id.* ("We conclude that when the power exercised or the function performed is one that . . . is not exclusive to a branch, it is not 'appertaining to' that branch and does not fall within the reach of the second clause of article V, section 1.").

¶85 Justice Lee advances two additional criticisms. First, he hints that if we read article V to permit a branch of government to perform

a task not within its traditional power, when that action does not encroach upon a power appertaining to another branch, the Legislature and Governor could ignore the express constitutional prohibitions on their constitutional power.[86] *Infra* ¶¶ 154–55. Nothing in the analysis I am describing suggests this conclusion. I do not read either article V or *In re Young* to permit either departments of government or the people they employ to disregard the express constitutional constraints on their power.

¶86 Justice Lee's argument equates the Utah Constitution's express limitations on the Legislature and Governor with the constraints on the "judicial power" that he opines are implied in the constitution. *Infra* ¶ 156. But, unlike the express limitations on executive and legislative power Justice Lee highlights, the framers of the Utah Constitution did not include the limitations Justice Lee advances—"justiciability, standing, and a general requirement of adversariness," *infra* ¶ 156—in article VIII of our constitution. Nor did the framers use the federal constitution's case or controversy language. And rather than parrot language about the meaning of our constitution purloined from cases unsupported by serious originalist inquiry, we should carefully examine the power the people of Utah anticipated the judicial branch would exercise.

¶87 Justice Lee also criticizes my exploration of article V and *In re Young* because it could lead to the conclusion that there is no constitutional prohibition on this court issuing an advisory opinion. *Infra* ¶ 161. Of course, the Utah Constitution contains no express prohibition on advisory opinions. The proposition that Utah courts are not authorized to issue advisory opinions can be found in *University of Utah v. Industrial Commission of Utah*, 64 Utah 273, 229 P. 1103 (1924). There we said that "[e]ven courts of general jurisdiction *have no power* to decide abstract questions or to render declaratory judgments, in the absence of an actual controversy directly involving rights." *Id.* at 1104 (emphasis added). But we conducted no originalist inquiry to reach that conclusion and simply

---

[86] For example, Justice Lee suggests that this reading of article V would permit the Legislature to ignore the constitutional requirement that the legislative session begin on the fourth Monday in January because to do so would not involve the exercise of judicial or executive power. *Infra* ¶ 154. That is not a separation of powers concern. That would involve the Legislature acting contrary to a restraint the people of Utah placed upon its authority.

relied on a three paragraph United States Supreme Court opinion. *See id.* (citing *California v. San Pablo & T.R. Co.,* 149 U.S. 308, 314 (1893)). And although we have made similar statements about advisory opinions from time to time, *see, e.g.*, *State v. Stromquist,* 639 P.2d 171, 172 (Utah 1981) (per curiam) ("This Court was not intended to be, nor is it endowed with authority to render advisory opinions, and has said so many times."), we did not undertake any originalist analysis until 2012.

¶88 In *Utah Transit Authority v. Local 382 of the Amalgamated Transit Union*, we concluded that "whatever else the judicial power clause may imply, it incorporates a prohibition on the issuance of advisory opinions by our courts." 2012 UT 75, ¶ 23, 289 P.3d 582. But the analytical path we took to reach that conclusion suggests there is room for additional originalist examination. We recognized that the text "'[t]he judicial power of the state' is 'vested in a Supreme Court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish,'" *id.* ¶ 20 (alteration in original) (quoting UTAH CONST. art. VIII, § 1), "does little to reveal the precise scope of the judicial power," *id.*

¶89 So we turned to "a page of state history" to shed "substantial light on what that power did—and *did not*—mean to the framers of our Utah Constitution." *Id*. ¶ 21. We noted that at the Constitutional Convention of 1895, delegate Thomas Maloney proposed an amendment to the constitution: "The justices of the supreme court shall be obliged to give their opinion upon important questions of law and upon solemn occasions when required by the governor, senate or house of representatives." *Id.* ¶ 21 n.5 (internal quotation marks omitted). The entire discussion of the amendment consists of five short paragraphs and sheds little, let alone substantial, light on the question of what the framers thought of the scope of the judicial power. *Id.*

¶90 Delegate F.S. Richards asked if other states had adopted the provision. *Id.* Maloney responded that "Massachusetts, Maine, Colorado, and a number of others" had. *Id.* (internal quotation marks omitted). Delegate D.C. Eichnor opined that he did not like the amendment because if a judge "should give their opinion to the governor, senate, or lower house, or all combined," and then "a case arises out of the matter," "the man can win the case, no matter if they were in the wrong." *Id.* (internal quotation marks omitted). Maloney replied that the amendment did "not apply to any such instances as the gentleman speaks of." *Id.* (internal quotation marks omitted).

¶91 Undeterred, Eichnor further spoke against the amendment, saying that even though he did "not know whether [the practice of permitting a state supreme court to provide advisory opinions had] fallen into disuse" in Massachusetts, he believed that it had. *Id.* (internal quotation marks omitted). Eichnor also opined that he thought article 22 of section VIII went "about as far in this matter as it should go" and that it "cover[ed] the ground fully." *Id.* (internal quotation marks omitted).[87]

¶92 That was the entirety of the debate. *See* II OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES OF THE CONVENTION 1397 (1898). Following that, a vote was taken and, according to the report of the convention, "the proposed section was rejected." *Id.*; *see also Utah Transit Auth.*, 2012 UT 75, ¶ 21 n.5.[88] The *Utah Transit Authority* court took that rejection, and the fact that a number of other states had rejected provisions concerning advisory opinions, to mean that "the Utah framers' conscious rejection of this practice speaks volumes." 2012 UT 75, ¶ 23. That court decided that its review of the history "confirms that whatever else the judicial power clause may imply, it incorporates a prohibition on the issuance of advisory opinions by our courts." *Id.*

¶93 I am not so sure about that. It appears that there is work to be done before we can be so definitive about the meaning of our constitution.[89] First, the clause the delegates to the Constitutional

---

[87] Section 22 of the original constitution provided that "District Judges may, at any time, report defects and omissions in the law to the Supreme Court, and the Supreme Court, on or before the first day of December of each year, shall report in writing to the Governor any seeming defect or omission in the law." UTAH CONST. art. VIII, § 22 (1895), *in* II OFFICIAL REPORT OF THE PROCEEDINGS AND DEBATES OF THE CONVENTION 1868–69 (1898) [hereinafter *Proceedings*]. In other words, the constitution directed the judiciary to offer an opinion as to how the Legislature might improve the law.

[88] In *Utah Transit Authority*, we report that the amendment was "roundly rejected by the body of the convention." 2012 UT 75, ¶ 21. The official report does not detail the vote, *see Proceedings* at 1397, so it is unclear whether the vote was close or not.

[89] And something Justice Lee says in his concurring opinion drives this point home. Justice Lee opines that "[w]ithout digging through state archives, it's difficult to know the content of the reports submitted in accordance with section 22." *Infra* ¶ 169. He

(Continued)

Convention rejected did not generally authorize advisory opinions. It allowed the governor, the senate, and the house to require this court to answer questions about Utah law. That presents separation of powers concerns that stretch beyond the question of whether a court has the power to issue an advisory opinion. Second, nothing in the very brief discussion of the amendment sheds any light into what the framers thought of the scope of the judicial power. And third, the original constitution required this court to report to the governor how the Legislature could fix and improve the law.

¶94 This demonstrates that the framers envisioned that this court would have the ability to do more than decide cases between adverse parties and would, at least in one annual report, opine on what the law should be.[90] Simply stated, it appears there is still room

---

nevertheless suggests that "if they're anything like the inter-branch reports we provide today, they lack some of the hallmark characteristics of advisory opinions." *Infra* ¶ 169. That is the point of this concurrence. I would prefer to know what those reports say before I draw conclusions about what they might tell us about the framers' views of the judicial power.

[90] Justice Lee refers to this an "expansive" reading of section 22, but he reads it the same way I do: that the courts were constitutionally empowered to "provide the Governor with a written report detailing 'seeming defect[s] or omission[s] in the law.'" *Infra* ¶¶ 170, 171 (alterations in original). Where we part ways is that Justice Lee is prepared to say that this was "a limited exception to the general rule," *infra* ¶ 170, whereas I would prefer to see more historical research before we definitively say what the people of Utah in 1895 would have understood to be within the power of the courts.

Justice Lee also asks, "What, for instance, would stop the courts from engaging in legislative rulemaking" if section 22 were read "expansive[ly]." *Infra* ¶ 171. The answer is simple; article V of the Utah Constitution. Passing legislation is a function "appertaining to" to the legislative department, and we cannot legislate without express constitutional authorization. *See* UTAH CONST. art. V, § 1.

Justice Lee posits that advisory opinions would nonetheless violate article V because they are "the functional equivalent" of legislation. *Infra* ¶ 171 n.118. That proposition is not self-evident and it is far from clear that "[a] nonbinding statement by a court of its interpretation of the law," *Advisory Opinion*, BLACK'S LAW

(Continued)

for originalist research and analysis on the question of this court's ability to issue advisory opinions.[91] And working backward from the conclusion that a particular reading of the Utah Constitution must be wrong because it would not forbid an advisory opinion may prove a problematic path.

¶95 When this issue next arises, a party advocating Justice Lee's position will need to address a number of concerns. A party will need to convince this court that article V presupposes two distinct inquiries. One that attaches if the Legislature delegates a power to the branch as a whole, and another that applies if the Legislature gives that power to a specific employee of that branch. For example, under Justice Lee's approach, if the Legislature passed a statute requiring the judicial branch to oversee the planting of trees on Arbor Day, we would ask whether that oversight responsibility was fairly contained in the judicial power; and if it wasn't, we would strike it down as unconstitutional. But if the statute gave that responsibility to the Chief Justice individually, we would run the question through the *In re Young* test and potentially reach a

---

DICTIONARY (11th ed. 2019), could be considered the same genus as "[t]he process of making or enacting a positive law in written form," *Legislation*, BLACK'S LAW DICTIONARY (11th ed. 2019).

But the relevant inquiry should focus on what the people of Utah would have understood the judicial power to include and the limitations they contemplated they were placing on the judiciary. To return to the leitmotif, I do not believe that our prior cases have done that work, and we owe it to the people of Utah to undertake that inquiry before we close the door on the meaning of our constitution.

[91] That having been said, much like adversariness, there are very good reasons why this court should refrain from issuing advisory opinions. But good policy may not translate into a constitutional prohibition.

different result.[92] Stated differently, a party will need to convince this court that in addition to article V, the Utah Constitution contains a separation of powers clause that we imply from the division of powers between the branches.[93] And that the framers of the Utah Constitution intended that to operate separately from the separation of powers clause that they actually included in the constitution.

¶96 A party advancing Justice Lee's position will also need to confront the question of what to do with historical examples of the exercise of jurisdiction over actions that lacked adverse parties. Specifically, that party will need to address whether those would have been viewed as part of the judicial power or as acceptable

---

[92] Justice Lee posits that perhaps the Legislature could give the Chief Justice power to oversee tree planting if he or she were "acting . . . as a private person." *Infra* ¶ 144 n.107. At best, this response simply assumes away the fact that would cause the constitutional problem. At worst, it creates a mechanism by which the Legislature can avoid a constitutional problem through sleight of hand. Faced with the prospect that asking the Chief Justice to oversee Arbor festivities would raise constitutional issues, the Legislature could simply appoint the Chief Justice in her personal capacity. Without serious evidence that this is the result the framers intended, I am hard-pressed to believe that they envisioned a regime that is so easily circumvented.

[93] Justice Lee asserts that this unwritten separation of powers clause "preserves the constitutional limits described in Articles VI, VII, and VIII." *Infra* ¶ 141. I presume that Justice Lee sees those limits inherent in three phrases: (1) "The Legislative power of the State shall be vested in [the Legislature and the people of the State of Utah]," UTAH CONST. art. VI, § 1; (2) "The executive power of the state shall be vested in the Governor who shall see that the laws are faithfully executed," *id.* art. VII, § 5; and (3) "The judicial power of the state shall be vested in a Supreme Court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish," *id.* art. VIII, § 1.

It bears noting two facts. First, nothing in articles VI, VII, and VIII expressly limits the power of each branch to the powers described in those articles. Second, the Utah Constitution contains an express separation of powers clause that defines the lines between the branches of government. *See id.* art. V, § 1.

exceptions to the exercise of that power.[94] These are questions that deserve exploration and examination before we conclude that we have definitively resolved them.

¶97    But again, we do not need to answer these questions to resolve this case. Nor do I express an opinion on the correct interpretation of article V, section 1. I write separately only to note that the analysis the majority foreshadows may be inconsistent with *In re Young* and how we have previously approached separation of powers questions under article V.

¶98    For these reasons, I concur in the majority opinion with these two exceptions.

---------------

ASSOCIATE CHIEF JUSTICE LEE, concurring:

¶99    The majority opinion appropriately assesses an important threshold question of justiciability. It recites a longstanding prerequisite to the exercise of "judicial power" under the Utah Constitution, noting that such power is generally limited to the determination of "controversies between adverse parties." *Supra* ¶ 12 (quoting *Carlton v. Brown*, 2014 UT 6, ¶ 29, 323 P.3d 571). And it states that the absence of a "dispute between opposing parties" in this case would normally lead to dismissal of the case "for lack of jurisdiction." *Supra* ¶ 12. But it ultimately concludes that this case falls within an exception to the general rule because "Utah courts frequently presided over non-adversarial hearings involving the termination or creation of parental rights" both "shortly before and directly after the adoption of the Utah Constitution." *Supra* ¶ 16.

¶100   I concur in the majority opinion without reservation. For reasons stated by the majority I agree that "the validation of gestational agreements falls within our courts' power over the

---

[94] That party will also need to address a corollary inquiry. If there are historical examples of judges exercising powers not traditionally considered part of the judicial power—for example, the power to appoint—should we reexamine our understanding of what the judicial power encompasses. Or is it evidence that when our constitution was ratified, the people of Utah would have understood that judges may sometimes undertake tasks falling outside our traditional notions of judicial power, as long as they do not "exercise functions appertaining to" another branch of government.

creation and termination of parental rights." *Supra* ¶ 17. I also agree with the majority's treatment of the merits of the case, and concur in the opinion in full.

¶101 I write separately, however, to speak to the questions raised by Justice Pearce in his concurrence. I do so reluctantly, and with some admitted trepidation. As the majority notes, it is entirely "unnecessary" for us to reach these issues in deciding "the case before us." *Supra* ¶ 18 n.24. If it were up to me, moreover, we would not be opining on the wide-ranging, important constitutional questions introduced into this case by Justice Pearce—as they are not squarely presented to us and have not been briefed by the parties. Justice Pearce has raised them, however, in anticipation of the effect our opinions here may have on "future cases."[95] *See supra* ¶ 56. And I write separately because I have a different take on the issues raised by Justice Pearce, and I think it important to provide my contrary perspective.

¶102 I recognize that my criticism of Justice Pearce's foray into unnecessary, unbriefed issues could also be pointed back at me. I, too, am engaging in independent analysis of these issues. I do so, however, not because I find this foray appropriate, but because I think a one-sided view of these issues (Justice Pearce's) is more

---

[95] This is no abstract possibility. While this case was pending, another one was heard in which there is an arguable lack of adversariness. *See In re Gray & Rice*, No. 20170046-CA (Utah argued Jan. 8, 2018) (appealing the denial of petitions for amendments to birth certificates to reflect a "sex change"). We stayed the disposition of that case pending our resolution of this one. Order to Stay the Appeal, *In re Gray & Rice*, No. 20170046-CA (Utah Nov. 29, 2018). And the analysis in our opinions in this case no doubt will inform the determination of whether *In re Gray & Rice* is properly before us. I do not see this case, however, as the right one in which to engage in an extensive discussion of the issues raised by Justice Pearce. I would prefer to await adversary briefing before delving into these questions. Because we lack such briefing here I would prefer to postpone our resolution of these issues for a case in which they are directly implicated—in *In re Gray & Rice* or in some other future case. Because Justice Pearce has offered his views on the matter, however, I write to express my contrary views in the interest of presenting a more complete picture in setting the stage for the "future case" that we are anticipating.

troubling than a more complete one (which includes my response). Ultimately, then, I would prefer that both of us stand down, and save our written analysis of these important issues for the "future case[]" that Justice Pearce seems to be considering—a case in which these questions are squarely presented, and in which we may be the beneficiaries of briefing. But because Justice Pearce has started the conversation, I (reluctantly) see the need to participate.

¶103 Justice Pearce offers two responses to the majority's justiciability analysis. He first questions the notion that "the Utah Constitution requires adversity between parties" as a prerequisite to the exercise of judicial power. *Supra* ¶ 60. And he next challenges the majority's assertion that "we are constitutionally limited to wield only judicial power." *Supra* ¶ 72.

¶104 These are fair questions worthy of discussion. And Justice Pearce posits possible answers to them. But I see these issues differently. First, I submit that the general requirement of adversariness is in fact deeply rooted in our case law and in the history and tradition of our adversary system of justice. Second, I suggest that the majority's approach to analyzing the powers of the judiciary is defensible on textual and historical grounds.

I

¶105 I do not share Justice Pearce's skepticism of the majority's assertion that adversariness is a general prerequisite to the exercise of judicial power under the Utah Constitution. Below I lay out the long line of cases that reaffirm this principle. Then I respond to Justice Pearce's concerns with the requirement stated in these cases.

A

¶106 The notion of a general requirement of adversariness is rooted deeply in our law. By the time of the framing of the Utah Constitution, it had been long settled that "[i]n every court there must be at least three constituent parts[:] . . . the actor, or plaintiff, who complains of an injury done; the reus, or defendant, who is called upon to make satisfaction for it; and the judex, or judicial power." 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 25 (photo. reprint, Univ. of Chi. Press 1979) (1768).[96] This

---

[96] *See also* Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 HARV. L. REV. 1559, 1568 & n.29 (2002) ("For centuries, Anglo-American lawyers have thought that the very existence of most kinds of judicial proceedings depends upon the

(Continued)

principle has deep roots in the British common law. *See id*. But it is also embedded in our American jurisprudence. By the time Utah became a state in the late 19th century the American courts had widely held that the judicial power was limited to the resolution of disputes—or at least to the entry of a judgment in a case involving a potential for a dispute between parties with adverse legal interests.[97]

---

presence (actual or constructive) of adverse parties."); The Honorable John Marshall, Speech Delivered in the House of Representatives of the United States, on the Resolutions of the Hon. Edward Livingston, Relative to Thomas Nash, Alias Jonathan Robbins (March 7, 1800), *in* 4 THE PAPERS OF JOHN MARSHALL 82, 96 (Charles T. Cullen ed., 1984) (stating that a justiciable case requires that "[t]here must be parties to come to court, who can be reached by its process, and bound by its power; whose rights admit of ultimate decision by a tribunal to which they are bound to submit"); *id*. at 95 ("A case in law or equity . . . was a controversy between parties which had taken a shape for judicial decision.").

[97] *Muskrat v. United States*, 219 U.S. 346, 361 (1911) (stating that judicial power "is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction"); *id*. at 357 (indicating that a case requires "the existence of present or possible adverse parties whose contentions are submitted to the court for adjudication" (quoting *In re Pac. Ry. Comm'n*, 32 F. 241, 255 (C.C.N.D. Cal. 1887))); *United States v. Duell*, 172 U.S. 576, 588 (1899) (concluding that the Court of Appeals of the District of Columbia could review the decision of the Commissioner of Patents; stating that "the proceeding in the [Court of Appeals] on an appeal in an interference controversy presents all the features of a civil case, a plaintiff, a defendant and a judge"); *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308, 314 (1893) ("The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it."); *Marye v. Parsons*, 114 U.S. 325, 330 (1885) ("[N]o court sits to determine questions of law *in thesi*. There must be a litigation upon actual transactions between real parties, growing out of a controversy affecting legal or equitable rights as to person or property."); *United States v. Ferreira*, 54 U.S. (13 How.) 40, 46 (1851) (indicating that certain determinations of treaty claims were not cases because, among other things, the United States was not authorized to appear as a party to oppose the claim).

¶107 It is therefore unsurprising that our Utah cases likewise embraced this principle. This court adverted to the requirement of adversariness at least as far back as *University of Utah v. Industrial Commission of Utah*, 229 P. 1103 (Utah 1924). There we stated that "courts of general jurisdiction have no power to decide abstract questions or to render declaratory judgments, *in the absence of an actual controversy* directly involving rights." *Id.* at 1104 (emphasis added). And we dismissed for lack of jurisdiction in the absence of "an actual case" or any "real controversy." *Id.* In so doing we quoted at length from *California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308 (1893), as follows:

> The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property *which are actually controverted* in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it.

*Univ. of Utah*, 229 P. at 1104 (emphasis added) (quoting *San Pablo & Tulare R.R.*, 149 U.S. at 314).

¶108 We expanded on this premise in *Citizens' Club v. Welling*, 27 P.2d 23 (Utah 1933). There we said that "the term 'judicial power' as employed in the Constitution . . . is largely determined by the nature or character of the function or power conferred and exercised" by the courts over time. *Id.* at 24. And we defined such power by reference to the "suits and actions" "between parties" that were historically decided by our courts. *Id.* at 24–25.

¶109 The *Welling* case raised the question of the constitutionality of a statute authorizing the Secretary of State (then an officer of the executive branch) to revoke the charter of a social club that allowed gambling. *Id.* at 23. A social club whose charter was revoked challenged the statute on the ground that it delegated to the executive a quintessentially judicial power. It asserted that the application of state laws prohibiting gambling required the government "to construe the law, ascertain facts, and make decisions" about a particular party. *Id.* at 25. And it insisted that this was the exercise of judicial power, which could not be delegated to the executive branch.

¶110　We rejected that argument. And in so doing we applied a simple framework for assessing the powers of the branches of the Utah government—in *Welling*, the executive and the judiciary. First we noted that "executive officers often are required to hear and determine many facts upon which their action is based but which is not judicial in the sense that it belongs exclusively to the courts." *Id.* at 26. Executive "officers," we explained, "frequently are required to construe the law, ascertain facts, and make decisions" that affect the rights of persons or entities. *Id.* at 25. They do so, however, in executing the law against a single party—in applying the law to the facts of a given person, and deciding whether to impose a sanction (or grant a right or permit) against that person.

¶111　Judicial power is different. *Welling* established the core basis for the difference: "The term 'judicial power of courts' is generally understood to be the power to hear and determine controversies between adverse parties and questions in litigation." *Id.* at 26. And the scope of the judicial power is defined by reference to the sorts of "suits and actions" heard "between parties" over time. *Id.* at 24–25.

¶112　Our *Welling* decision was based on that square holding. The Secretary of State could properly be tasked with sanctioning non-compliant social clubs because the imposition of a sanction (while involving fact-finding and legal analysis) involved executive power—the imposition of a sanction on a person or entity. And the Secretary of State's exercise of that power did not tread into the domain of the judiciary because it did not involve the adjudication of a dispute "between adverse parties . . . in litigation." *Id.* at 26.

¶113　This framework has been repeatedly reinforced in our case law. As Justice Pearce concedes, we have "quoted" and reaffirmed the *Welling* standard "a number of times since" it was announced. *Infra* ¶ 137 (citing *Judd v. Drezga*, 2004 UT 91, ¶ 37, 103 P.3d 135; *Salt Lake City v. Ohms*, 881 P.2d 844, 849 (Utah 1994); *Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984)).[98] And this string of cites is hardly exhaustive.

---

[98] Justice Pearce questions the weight of this authority on the ground that there were adverse parties in *Welling*, *Judd*, *Ohms*, and *Timpanogos Planning & Water*. *Supra* ¶ 62. But this response ignores two indisputable facts. First is the historical fact that at the time of the framing of the Utah Constitution "the American courts had widely held that the judicial power was limited to . . . the entry of a

(Continued)

This court repeatedly has reinforced the proposition that the essence of the judicial power is the resolution of disputes. *See, e.g.*, *State v. Guard*, 2015 UT 96, ¶ 59, 371 P.3d 1 ("When exercising our judicial power, we resolve concrete disputes presented by parties . . . ."); *State v. Robertson*, 2017 UT 27, ¶ 40, 438 P.3d 491 ("The judicial power, on the other hand, is limited to 'resolving specific disputes between parties as to the applicability of the law to their actions.'" (quoting *Carter v. Lehi City*, 2012 UT 2, ¶ 37, 269 P.3d 141)).

¶114   The *Welling* framework is solidly grounded in principles required by the Utah Constitution—principles we have repeatedly highlighted. We first highlighted these constitutional principles in *In re Handley's Estate*, 49 P. 829 (Utah 1897). *Handley's Estate* involved the enactment of legislation aimed at undoing the effect of a judgment or decree of the Utah courts. The decree had ruled that only the "lawful wife" of a deceased and her children were entitled

---

judgment in a case involving [at least] a potential for a dispute between parties with adverse legal interests." *Supra* ¶ 106. This historical premise is significant. It suggests a good reason for the absence of the fact-pattern that Justice Pearce finds lacking. We may not have articulated the requirement of adversariness in a case in which it was lacking, but that may just be because that requirement was so deeply embedded in our history and tradition that no one thought to challenge it.

That leads to a second response to Justice Pearce: Our cases have spoken with a single, longstanding voice in articulating a requirement of adversariness as an element of the judicial power. *Welling* speaks unmistakably in defining "the term 'judicial power' as employed in the [Utah] Constitution." *Citizens' Club v. Welling*, 27 P.2d 23, 24 (Utah 1933). It says that the "term 'judicial power . . . ' is generally understood to be the power to hear and determine controversies between adverse parties and questions in litigation." *Id.* at 26. Our later cases have repeatedly reaffirmed this central tenet of judicial power. *See Judd v. Drezga*, 2004 UT 91, ¶ 37, 103 P.3d 135; *Salt Lake City v. Ohms*, 881 P.2d 844, 849 (Utah 1994); *Timpanogos Planning & Water Mgmt. Agency v. Cent. Utah Water Conservancy Dist.*, 690 P.2d 562, 569 (Utah 1984). So the fact-pattern presented here (a single-party case on appeal) may not appear in our precedent. But the general requirement of adversariness has been clearly stated over the course of many decades. And I see no basis for questioning it here.

to succeed to the assets of a decedent's estate, and that a second, plural wife and her children were foreclosed from succession. *Id.* at 829. Years later, after "the time within which a motion for rehearing could be made," the legislature enacted a law providing that governing statutes should "at all times" have been interpreted to allow "the issue of bigamous and polygamous marriages . . . to inherit," and allowing for the filing of a "motion for a new trial" in any case based on a different view of the law. *Id.* (quoting Act of March 9, 1896, §§ 1–2). This court struck down that statute as an *ultra vires* act by the legislature. *Id.* at 831. And in so doing we framed the fundamental tenets of the separation of powers principles later set forth in *Welling*.

¶115 We first described the nature of the judicial power exercised by the court in entering the probate decree—in entering a decree on a "trial of a case," or in other words resolving a "contention[]" among competing parties. *Id.* at 830. And we held that such power cannot properly be exercised by the legislature: "After the court has interpreted or construed a statute on the trial of a case, and rendered judgment, the legislature cannot affect it by a declaratory or explanatory law, giving the law under which the decree was rendered a different construction." *Id.* "To hold that the legislature can," we said, "would recognize the lawmaking department as a court of errors, with power to overturn all judgments and decrees depending upon the interpretation or the construction of statutes." *Id.* And we emphasized the importance of separating these powers instead of allowing them to be consolidated in a single branch. *See id.* (noting that "concentration of power would give to the class of officers possessing it absolute power, and that would amount to a despotism").

¶116 *Handley's Estate* deemed the legislation in question "a plain attempt on the part of the legislature to exercise judicial powers." *Id.* And it established the core element of judicial power—in the resolution of "contentions" by competing claimants.

¶117 *Handley's Estate* also clarified the relationship between the judicial power and the legislative power. In *Handley's Estate* we noted that the legislature's prerogative is to "promulgate an ordinance for a whole class of rights in the community." *Id.* at 832. And we distinguished that from the judicial act that the legislature had attempted—in seeking "to *regulate a case* which had already occurred." *Id.* (emphasis added). Thus, we struck down the enactment of the legislature because we found that that branch of government had "assumed the right to declare the law had an

operation and effect with respect to [specific] cases"—a power we found to be inherently judicial. *Id.*

¶118   We expanded on these same themes more recently in our decision in *Carter v. Lehi City*, 2012 UT 2, 269 P.3d 141. The question in *Carter* concerned the extent of the power of the people to exercise legislative power by initiative—a right guaranteed by Article VI of the Utah Constitution. In defining the scope of that power we noted that the power of the people to legislate is "coextensive" with the power of the legislature. *Id.* ¶ 20. And we reformulated our case law standards defining the initiative power by reference to the nature of "legislative" power under Article VI. In so doing we noted that "[o]ur understanding of the legislative power is informed by its placement in relation to—and separation from—the executive and judicial power." *Id.* ¶ 33. With that in mind, we proceeded to outline the contours of the legislative, executive, and judicial power under our state constitution. And we did so in a manner right in line with our framework in *Welling* and *Handley's Estate*.

¶119   *Carter* says that legislative power involves the "promulgation of laws of general applicability." *Id.* ¶ 34. It also notes that "[t]his hallmark of legislative power can be highlighted by contrasting this power with its executive and judicial counterparts." *Id.* ¶ 37. "Once a general rule is established by the legislature, its enforcement is left to the executive (by applying it to the particularized circumstances of individuals, through functions like prosecution or licensing) and its adjudication is left to the judiciary (by resolving specific disputes between parties as to the applicability of the law to their actions)." *Id.* (footnote omitted). Thus, executive acts involve "case-specific considerations as to whether the acts of a particular person fall within the general rule adopted by the legislature." *Id.* ¶ 47. And judicial acts involve the resolution of "disputes regarding the application of legislative acts to the circumstances of individual cases." *Id.* ¶ 50.

¶120   We reinforced this construct of the judicial power in our decision in *Utah Transit Authority v. Local 382 of the Amalgamated Transit Union*, 2012 UT 75, 289 P.3d 582. There we rejected the notion of a common-law "public interest" exception to the doctrine of mootness—the idea that mootness is a "principle of our own creation," which we can "abolish . . . at our whim" if "the question presented is sufficiently important or interesting to merit our attention." *Id.* ¶ 17. We did so on the ground that the doctrine of mootness "is an element of the principles defining the scope of the 'judicial power' vested in the courts by the Utah Constitution."

*Id.* ¶ 18. And we therefore proceeded to delineate the basic contours of the judicial power.

¶121   In so doing we "reiterated" the longstanding principle "that when a court 'ascertain[s] that there is no jurisdiction in the court because of the absence of a justiciable *controversy*, then the court can go no further, and its immediate duty is to dismiss the action.'" *Id.* ¶ 19 (alteration in original) (emphasis added) (quoting *Baird v. State*, 574 P.2d 713, 716 (Utah 1978)). And we explained that this standard "find[s] support in the text and original understanding of the judicial power clause of the Utah Constitution." *Id.* ¶ 20. We quoted the operative text of Article VIII, which provides that "'[t]he judicial power of the state' is 'vested in a Supreme Court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature may by statute establish.'" *Id.* (alteration in original). And we noted that this "make[s] one fundamental point abundantly clear: The scope of our authority is not a matter for the courts to define at our preference or whim; we are constitutionally limited to wield only 'judicial power' and may not act extra-judicially (regardless of how interesting or important the matter presented for our consideration)." *Id.*

B

¶122   Justice Pearce concludes that "we have never" squarely examined whether the Utah Constitution "requires adversity between parties as a jurisdictional prerequisite." *Supra* ¶ 60. And he accordingly raises concerns about the viability of this principle. I see the matter differently. I find no room to quarrel with the requirement of adversariness in our law of justiciability.

¶123   We have repeatedly cited the notion of adversariness as an essential hallmark of the judicial power. And we have emphasized the point by noting that the application of the law to a single person or entity is the essence of executive power. *See Carter*, 2012 UT 2, ¶ 34; *Welling*, 27 P.2d at 26. This is a long-established, deeply embedded tenet of our case law. And in my view Justice Pearce has not identified a persuasive ground for doubting it.

¶124   In *University of Utah v. Industrial Commission of Utah*, we stated that "courts of general jurisdiction have no power to decide abstract questions or to render declaratory judgments, in the absence of an *actual controversy* directly involving rights." 229 P. 1103, 1104 (Utah 1924) (emphasis added). Similarly in *Welling* we stated that the "'judicial power of the courts' is generally understood to be the power to hear and determine controversies between *adverse parties*

and questions in litigation." 27 P.2d at 26 (emphasis added). The "power" we were speaking about in both cases is the only power our courts have—the constitutionally conferred "judicial power." *See* UTAH CONST. art. VIII, § 1. And we've made clear that that power is limited to resolving "controversies between adverse parties." *Welling*, 27 P.2d at 26. So, contrary to Justice Pearce's contention, we have determined that the adversity requirement is a constitutional prerequisite to our exercise of jurisdiction.

¶125 Justice Pearce attempts to discredit the language in *University of Utah*, *Welling*, and other cases on the ground that it may not "reflect the reality of judicial practice either currently or at the time of statehood." *Supra* ¶ 64. To support this argument, he cites a number of nonadversarial proceedings that historically were entertained in the Utah courts. *Supra* ¶ 63. It may be true that our courts have presided over some "proceedings that had the potential to lack adverse parties."[99] *Supra* ¶ 63. But even if so, these would be exceptions to the rule. The categories of cases identified by Justice Pearce seem distinguishable in any event. An adoption or a probate case is a matter *in rem*—a matter initiated by notice to the public of the pendency of an action in which any and all claimed interests in the *res* (the child or the estate) will be adjudicated. *See* Ann Woolhandler, *Adverse Interests and Article III*, 111 N.W. U. L. REV. 1025, 1036–43 (2017). Such cases are inherently adverse in the sense that they will inevitably involve the entry of a judgment that will conclusively cut off the rights of interested claimants.[100] And although they may be filed by a single party, a competing claimant is on notice of the pendency of the action and the potential that her rights will be foreclosed if she does not intervene and object. In that

---

[99] *But see generally* Ann Woolhandler, *Adverse Interests and Article III*, 111 N.W. U. L. REV. 1025, 1036–43 (2017) (defending the requirement of adversariness and distinguishing apparent exceptions).

[100] *See id.* at 1032–34 (explaining that "adverse legal arguments" are not necessary to the exercise of judicial power so long as there are "adverse legal interests that will be affected by a decree," notice to adverse parties, and an opportunity for adverse argument, and a request for entry of a judgment); *id.* at 1034-35 (noting that "in rem-type proceedings necessarily include the potential for a form of default, just as in personam actions do," and concluding that the mere possibility of a lack of adversary argument, as with entry of default, does not mean there is no requirement of adversariness).

sense the *in rem* action is not much different from any of a number of *in personam* actions that may be resolved without an appearance by a party.[101] A collection action is a good example. Such an action may implicate the rights of a debtor. But most collection cases are resolved by default. That doesn't make them non-adversary in nature. And the adoption and probate cases seem to me to be comparable. They involve a contest between parties—competing claimants—and not the mere execution of the law as applied to a single person or entity.

¶126 The name change example cited by Justice Pearce may be harder to reconcile. *See supra* ¶ 63. And I suspect there may be other examples of single-party actions that have been filed in our courts. But that leaves the question of the proper inference to draw from the existence of these kinds of cases. The mere existence of historical "cases" lacking in adversariness is not a sufficient ground for ignoring a longstanding limitation on the judicial power. That limitation is too deeply embedded in our law, history, and tradition to abandon it at the first sight of an apparent exception.

¶127 Historical exceptions to the general rule could be viewed as excesses—actions beyond the scope of the judicial power. Not all historical *applications* of a constitutional provision, after all, can be viewed as falling within the historical understanding of the legal principle embedded in such provision.[102] The meaning of the constitution is dictated by the historical understanding of the language ratified by the people.[103] And because the "judicial power"

---

[101] *See id.* at 1036–43.

[102] *See* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1, 21 (2015) (explaining that original public meaning originalism claims that the "communicative content" of the Constitution is fixed; noting that historical applications are not necessarily embraced or fixed, but could be a result of a factual or historical mistake).

[103] *See Zimmerman v. Univ. of Utah*, 2018 UT 1, ¶ 22, 417 P.3d 78 (reminding parties making constitutional arguments to ground them in the "text or original meaning of the Utah Constitution"); *State v. Hernandez*, 2011 UT 70, ¶ 8, 268 P.3d 822 ("[O]ur analysis 'begin[s] with a review of the constitutional text.'" (second alteration in original) (quoting *Dexter v. Bosko*, 2008 UT 29, ¶ 11, 184 P.3d 592)); Lawrence B. Solum, *The Interpretation-Construction Distinction*, 27

(Continued)

historically is understood to include a requirement of adversariness, the most natural reaction to Justice Pearce's name change example could be that this falls beyond the proper exercise of that power.

¶128 I can also see a second response. We could view a name change as simply a limited exception to the general rule. More generally, we could endorse historically recognized exceptions *as exceptions to the general rule*. That is a much more measured, and in my view more appropriate, response to the history cited by Justice Pearce. It makes more sense to me to see exceptions as exceptions than as an indication that our courts have never really meant what we said when we identified adversariness as a central tenet of the judicial power. Going forward, we could decide whether a future single-party action fits within an historically recognized exception. And, if not, we could conclude that the general rule (requiring adversariness) is controlling.

¶129 Either of these approaches is a more measured response than the one suggested by Justice Pearce. We can make room for the name change example without abandoning the requirement of adversariness that is embedded in both our nation's history and our Utah precedent.

¶130 We need not resolve this problem here, however. We are not required to decide whether and to what extent single-party actions like the name change petitions fall within the reach of the judicial power under Article VIII. The only question presented today is whether the legislative authorization of an uncontested petition under a gestational agreement is properly justiciable. And I am comfortable, for reasons presented in the majority opinion and elaborated upon here, that this case is justiciable—because it is functionally indistinguishable from an uncontested adoption proceeding, which is both deeply rooted in our history and effectively "adversary" in the *in rem* sense.

¶131 I see no ground for any further questioning of our longstanding requirement of adversariness. The lack of an express reference to a requirement of a "case" or "controversy" in Article

---

CONST. COMMENT. 95, 101 (2010) ("[T]he linguistic meaning of the Constitution is the meaning that the constitutional text had to the competent speakers of American English at the time the Constitution was framed and ratified.").

VIII seems to me not to tell us much.[104] The federal reference to "cases" and "controversies" is in Article III, Section 2—a clause that limits the subject matter jurisdiction of federal courts. But our state courts are courts of plenary subject-matter jurisdiction, so there is no need for a state analog. The operative clause in both the federal and state constitution, in any event, is in the conferral on the courts of "judicial power." UTAH CONST. art. VIII, § 1; U.S. CONST. art. III, § 1.[105] And the "judicial power," as noted, has long been understood to carry traditional limits on authority—as in prohibitions on the issuance of advisory opinions and the requirements of standing. *See Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 23, 289 P.3d 582.

---

[104] *See Gregory v. Shurtleff*, 2013 UT 18, ¶ 69, 299 P.3d 1098, 1120 (Lee, J., concurring in part and dissenting in part) (concluding that "although our constitution does not limit our authority (as the federal constitution does) to the resolution of a 'case or controversy,' the lack of such restriction is hardly a *carte blanche* license to reach out to exercise any power we deem expedient," and setting forth the basis for the conclusion that courts are limited to the exercise of "judicial power" as traditionally understood (internal citation omitted)).

[105] Because the Utah constitution and the United States constitution both use the same "judicial power" language, it may be helpful to look to federal case law to better understand the nature of our requirement of adversariness. Justice Pearce attempts to preempt this move by arguing that "federal law regarding adversariness may prove of limited utility." *Supra* ¶ 68. He notes that like Utah's courts, federal courts historically "presided over a number of proceedings that did not require adverse parties." *Supra* ¶ 68. And he suggests that this historical evidence may be sufficient to undercut our confidence in a federal adversariness requirement. *Supra* ¶¶ 66, 68. But the historical examples he cites are either distinguishable or are long-recognized exceptions to the general rule. *See supra* ¶¶ 125-128; *see also supra* ¶ 125 n.99. And I see no need to rely on federal case law to make sense of our own justiciability requirement. We have been quite clear in announcing that adversariness is a prerequisite to our exercise of jurisdiction. *See, e.g., Robertson*, 2017 UT 27, ¶ 40; *Welling*, 27 P.2d at 26; *Univ. of Utah*, 229 P. at 1104. I see no basis for backing away from that established proposition here.

¶132 The requirement of adversariness is no different. Our exercise of judicial power, moreover, "must be in the context of the issuance of 'writs' or in our resolution of 'cases,' a formulation that implies a particular form for exercising the judicial power." *Gregory v. Shurtleff*, 2013 UT 18, ¶ 73, 299 P.3d 1098 (Lee, J., concurring in part and dissenting in part); *see also* UTAH CONST. art. VIII, §§ 1, 3, 5 (recognizing judicial power to issue "writs" and decide "cases"). That means that the scope of the judicial power is defined by the "types of writs and cases traditionally resolved in the courts" historically. *Gregory*, 2013 UT 18, ¶ 74 (Lee, J., concurring in part and dissenting in part).

¶133 This is the traditional understanding of the judicial power. And the traditional formulation carries a requirement of adversariness even without an express "case and controversy" clause—just as it carries a requirement of standing and a prohibition on the resolution of moot disputes. *See Utah Transit Auth.*, 2012 UT 75, ¶ 18; *see also Gregory*, 2013 UT 18, ¶ 73 n.7 (Lee, J., concurring in part and dissenting in part) (noting that although our courts "may not be limited to the resolution of what amounts to a federal 'case or controversy,' they are confined to the exercise of the 'judicial power' in the issuance of 'writs' and the decision of 'cases,'" and that "[w]hatever the differences" between the state and federal constitution, "it surely cannot be said that our judicial power is unfettered, or that it is subject to any evolving limits that we may wish to impose").

¶134 For these reasons I would not lightly presume that our Utah framers made a conscious decision to open the doors of our courts to single-party petitions. Such a conclusion would not just contradict many decades of case law. It would also undermine the premises of our adversary system of justice. And it would require our courts to take on roles we are politically and institutionally ill-equipped to tackle.

¶135 We assign executive tasks to the executive for good reasons. When the government makes an executive decision—as in permitting, licensing, or prosecuting—it is engaged in an inquisitorial endeavor. It is investigating, evaluating, and resolving a matter on behalf of the public. Our courts are not designed for such tasks. We are unrepresentative and largely unaccountable to the people. And we are not set up for independent investigation.

¶136 For all these reasons I would reaffirm rather than question our longstanding commitment to the requirement of adversariness. For many decades our cases have reinforced this premise of judicial

power. And our entire branch of government is built around this principle. I would not abandon it here.

II

¶137 Justice Pearce's second concern goes to the majority's statement that "we are constitutionally limited to wield only judicial power." *Supra* ¶ 12 (citation omitted) (internal quotation marks omitted). He argues "that the legislative, executive, and judicial branches of government may be tasked with responsibilities not plainly within their respective spheres, so long as those responsibilities do not unconstitutionally infringe on another branch's duties." *Supra* ¶ 72. This position, he contends, is supported by Article V of the Utah Constitution and our precedent.

¶138 I read our constitution differently. The limits of each branch's powers seem to be circumscribed by the terms and conditions of Articles VI, VII, and VIII. The first clause of Article V suggests as much. *See* UTAH CONST. art. V, § 1 ("The powers of the government . . . shall be divided into three distinct departments . . . ."). The second clause of Article V seems to speak to a separate inquiry—the limits of the powers of *people* "charged with the exercise of powers properly belonging to one of" the branches. *Id*. And cases implicating those limits are resolved using the *In re Young* framework.

¶139 I present this position below before raising some points of disagreement with Justice Pearce's approach. I do so without offering a definitive statement on the constitutional limits of our power. Such a statement is not necessary here. Again, my preference would be not to opine on any of the issues raised by Justice Pearce. I write only to respond to him—to provide a counter-balance to what would otherwise stand as a one-sided statement of our law in anticipation of a "future case." *See supra* ¶ 101 n.95.

A

¶140 We have adopted a consistent framework for assessing the powers of the three branches of state government under the Utah Constitution. The judicial power, as noted, has long been defined by reference to the text and original meaning of Article VIII. *See Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 20, 289 P.3d 582. And we have followed the same pattern in considering the powers of the legislative and executive branches of government—looking to the text and history of Article VI to define the legislative power, *see Carter v. Lehi City*, 2012 UT 2, ¶ 22, 269 P.3d 141, and the text and history of Article VII to define the executive

power, *see id.* ¶ 49; *Citizens' Club v. Welling*, 27 P.2d 23, 26 (Utah 1933).

¶141 This framework gives meaning to all provisions of the constitution. It preserves the constitutional limits described in Articles VI, VII, and VIII.[106] And it pays respect to the language of Article V, section 1. That section has two clauses—one that reinforces the notion that "[t]he powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the

---

[106] Justice Pearce expresses some skepticism of the view that these articles establish a separation of powers. *Supra* ¶ 95 n.93. He claims that "nothing in articles VI, VII, and VIII expressly limits the power of each branch to the powers described in those articles." *Supra* ¶ 95 n.93. Yet each of the clauses he quotes expressly vests the powers of government in one and only one branch of government. Article VIII, for instance, states that "[t]he judicial power of the state shall be vested in a Supreme Court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish." UTAH CONST. art. VIII, § 1. Because the judicial power is vested solely in the courts, the clear "negative implication" is that the executive and legislative branches may not exercise judicial power. *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2010) (describing the negative-implication canon). The same goes for the vesting of legislative power in the legislative branch and the vesting of executive power in the executive branch. UTAH CONST. art. VI, § 1; art. VII, § 5. It is only the legislature (and "the legal voters of the State") that may exercise legislative authority and the executive that may exercise executive authority.

The fact that each branch is given specific and narrow authority comports with the strict separation of powers mandate found in article V—"[t]he powers of the government of the State of Utah *shall* be divided into three *distinct* departments." UTAH CONST. art. V, § 1 (emphasis added). So I remain convinced that articles VI, VII, and VIII describe constitutional limits—the judicial branch has only judicial power, the legislative branch has only legislative power, and the executive branch has only executive power. The grants of authority, in other words, are exclusive. So "when the [g]overnment is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it." *Dep't of Transp. v. Ass'n of Am. R.R.s*, 135 S. Ct. 1225, 1241 (2015) (Thomas, J., concurring).

Executive, and the Judicial," and a second that provides that "no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted." UTAH CONST. art. V, § 1.

¶142 The first clause simply reinforces the terms and conditions of Articles VI, VII, and VIII, which define the powers of the legislative, executive, and judicial branches of our government. And the second seems to speak not to the exercise of power of a branch *qua* branch, but to the exercise of power by any "*person* charged with the exercise of powers properly belonging to one of these departments." *Id.* (emphasis added). It places limits on the ability of such a person to also "exercise any functions appertaining to either of the other[]" branches—stating that he or she may not do so "except in the cases . . . expressly directed or permitted" by the constitution. *Id.*

¶143 We addressed this language in *In re Young*. There we were asked to determine the constitutionality of a statute providing for participation by individual members of the legislature on the Judicial Conduct Commission. *In re Young*, 1999 UT 6, ¶¶ 3–5, 976 P.2d 581. We looked to Article V because it speaks directly to the question of the constitutionality of the exercise of governmental power by a "person charged with the exercise of powers properly belonging to" one of our branches of government. We adopted a three-step test to apply the language of Article V. That test asks (1) whether governmental officials are "'charged with the exercise of powers properly belonging to' one of the three branches of government"; (2) whether the function given to such officials is "one 'appertaining to' another branch of government"; and (3) whether the constitution "'expressly' direct[s] or permit[s] the exercise of the otherwise forbidden function." *Id.* ¶ 8.

¶144 Applying this test, our *Young* opinion upheld the constitutionality of the composition of the Judicial Conduct Commission. *Id.* ¶ 6. But in so doing we did not articulate an omnibus test for assessing the scope of powers of our three branches of government. Nor did we override the case law cited above, which says that we measure the powers of the three branches of government by reference to the constitutional articles that define their powers (Articles VI, VII, and VIII). Rather we recognized limits on the exercise of power by *persons* serving in one branch but

exercising power "appertaining" to a different branch.[107] This is the domain of the second clause of Article V, section 1.

¶145 Justice Pearce is thus right that I am suggesting that "[A]rticle V presupposes two distinct inquiries." *Supra* ¶ 95. The two distinct inquiries follow from the two clauses of Article V—one that speaks to the powers of one of our three branches of government and the other that speaks to the propriety of a "person charged with the exercise" of the powers of one of the branches also exercising

---

[107] It may not always be easy to determine whether a person is acting on behalf of a branch of government or merely as a private individual. But the text and structure of Article V require us to attempt to draw that line.

The precise boundaries of the line will have to await an appropriate case. For now, I would simply observe that there will be easy cases—cases in which it is apparent that a person is acting as a representative of a particular branch of government and not as a private person. Those cases, in my view, would necessarily encompass a circumstance in which a judge is acting *as a judge* to fulfill the responsibilities assigned by the constitution to a judge. *See* UTAH CONST. art. VIII, §§ 2–5. And such cases may also extend to the actions of the Chief Justice in making an appointment on behalf of the judicial branch of government, *see infra* ¶¶ 146–48, or otherwise acting as the head of our branch of government.

This may be the answer to Justice Pearce's "Arbor Day" hypothetical. *See supra* ¶ 95. It may well be unconstitutional for the legislature to "requir[e] the judicial branch to oversee the planting of trees on Arbor Day." *Supra* ¶ 95. That would certainly follow if the exercise of such function exceeds the scope of the "judicial power" assigned to our branch of government in Article VIII. What if the statute "gave that responsibility to the Chief Justice individually"? Perhaps it would depend on whether the Chief Justice's appointment is in his official capacity as Chief Justice (or head of the judicial branch), or whether he is acting instead as a private person. These are questions for another day. But in my view these questions do not undermine the inquiry that is called for by the structure of Article V. To the contrary, they are the very questions the text of Article V demands. I am accordingly not troubled by the fact that the legislature could perhaps "circumvent[]" a potential constitutional issue by appointing individuals in their personal capacity. *Supra* ¶ 95 n.92. If the plain language of our constitution permits this, I see no reason for us to be concerned.

"functions appertaining to either of the others." If we are to credit both clauses it seems that we should endorse two distinct inquiries.

¶146 Justice Pearce's hypothetical, *supra* ¶ 79, helps highlight the significance of the structure of Article V—of the distinction between the powers of the branches of our government (controlled by the first clause of Article V and the provisions of Articles VI, VII, and VIII, which are incorporated by reference therein) and the limitations on the powers of "persons" serving in these branches (controlled by the second clause of Article V). The hypothetical implicates two distinct questions: (a) whether the judicial department of government may "appoint" persons to a legislatively created "commission"; and (b) whether a person serving in the judicial branch may serve on that commission. The latter question is in fact a question for Article V. To answer that question we would ask whether a judge (a "person charged with the exercise of [judicial] powers") is exercising "powers properly belonging" to another branch of government. UTAH CONST. art. V, § 1. And that question would be resolved under the *In re Young* test.

¶147 The former question does not seem to be a matter for Article V, however. This question, highlighted by Justice Pearce, is whether the judicial branch of government may exercise a power of "appointment" in these circumstances. Justice Pearce says that we should ask "whether, in making an appointment" to this commission, the judicial branch is "fulfilling a function appertaining to another branch"—the executive. *Supra* ¶ 79. But this question does not seem to fall within the domain of Article V. Here we are not asking whether a "person" fulfilling the duties of a judge may also fulfill a function "properly belonging" to another branch of government. We are asking whether the judicial branch of government itself has the power to appoint. And the answer to that question would be informed by longstanding practice and a historical understanding of the terms of Article VIII. The head of a branch of government like this one has long exercised the power to administer and coordinate the work of that branch.[108] This includes

---

[108] *See* UTAH CONST. art. VIII, § 12 (identifying the Chief Justice as the "chief administrative officer" of the judicial branch); *State v. LaFrance*, 471 A.2d 340, 344–45 (N.H. 1983) ("The power of the judiciary to control its own proceedings, the conduct of participants, the actions of officers of the court and the environment of the court is a power absolutely necessary for a court to function effectively and

(Continued)

the power to appoint judges to serve on committees and serve various administrative functions.[109]

¶148 Justice Pearce raises the question whether our Chief Justice's appointment power could extend to a body that performs legislative and executive functions. *Supra* ¶ 79 n.84. This is a trickier question—one that would require more careful originalist analysis and briefing in an appropriate case. On this Justice Pearce is certainly correct—"we do not need to answer these questions to resolve this case." *Supra* ¶ 97. If and when we do need to answer these questions, however, I think the question would still be one for Article VIII—not for the *Young* test. The judicial power to appoint a person to a hybrid governmental body, in other words, would have to be rooted in some established, historical understanding of judicial power, not in the mere notion that such power would not encroach on the powers of the executive branch.

---

do its job of administering justice."); *Zylstra v. Piva*, 539 P.2d 823, 827 (Wash. 1975) (en banc) ("[T]he ultimate power to administer the courts clearly rests with the judiciary.").

[109] *See Ex parte Siebold*, 100 U.S. 371, 397–99 (1879) (recognizing that the appointment power is not incompatible with the judicial power); *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 259–61 (1839) (upholding a court's power to appoint its own clerk).

Justice Pearce suggests that these cases are not directly "tethered to the question of what the people of Utah would have understood article V to mean." *Supra* ¶ 79 n.83. I disagree. "Judicial power" is a legal term of art transplanted from the United States Constitution. *See* U.S. CONST. art. III, § 1. So what the federal courts understood "judicial power" to encompass seems highly relevant to understanding how the term would have been understood in 1895 by the people of Utah. *See Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 ("[W]hen a word or phrase is 'transplanted from another legal source . . . it brings the old soil with it.'" (citation omitted)). And in any event, I am not claiming to have exhausted originalist research into whether "judicial power" encompasses a limited power of appointment. I raise these cases to offer a response to Justice Pearce's hypothetical—a hypothetical used to highlight questions on which we have no briefing and that are not before us in this case. *See supra* ¶ 101 n.95.

B

¶149   Justice Pearce offers a different take on Article V and *In re Young*. He does not read them to draw a distinction between *persons* and *branches*. Instead he suggests that when assessing whether "the [l]egislature may authorize or assign to the judicial *branch* functions not traditionally understood to be encompassed in [the judicial] power" we should apply the *Young* framework. *Supra* ¶¶ 75-77 (emphasis added). I concede that *In re Young* could be read to eliminate the distinction between persons and branches. *Young* states that unless a function is "one that is essential, core, or inherent in the very concept of one of the three branches of a constitutional government[,] . . . the function is not one barred to other branches, or to members of those branches." *In re Young*, 1999 UT 6, ¶ 26, 976 P.2d 581. And this is not the only reference to a branch of government exercising non-essential powers we might typically associate with another branch. *Supra* ¶ 84. So I can see grounds for skepticism about whether *Young* draws a "substantive distinction between the roles individuals may fulfill and the authority their respective departments may exercise." *Supra* ¶ 83.   But I also see some significant problems with his approach.

¶150   First, Justice Pearce's reading of *Young* appears to run afoul of the language of Article V. That article clearly speaks in terms of *persons* and not *branches*. It states "no *person* charged with the exercise of powers properly belonging to one of [the branches], shall exercise any functions appertaining to either of the other[] [branches]." Utah const. art. V, § 1 (emphasis added). Justice Pearce's response to this criticism is that "it is not apparent how [the distinction between people and branches] would make much practical difference." *Supra* ¶ 83. After all, he says, "[b]ranches of government act only through the individuals they employ." *Supra* ¶ 83. That may be true. But not all persons serving in a branch of government are acting *on behalf of* that branch of government in everything they do. The second clause of Article V makes this point clear. Sometimes a person "charged with the exercise" of the powers of one branch of government may be called on to fulfill "functions appertaining" to another. If such a person is acting as a "person" and not as a representative of the branch of government, then it seems that the *Young* inquiry is called into play.

¶151   The plain meaning of "person" is also distinct from the meaning of "branch" (or, to use the constitution's language, "department"). And our job is first and foremost to apply the plain meaning of the text of the constitution. *Grand Cty. v. Emery Cty.*, 2002

UT 57, ¶ 29, 52 P.3d 1148. We should not interpret the constitution in a way that essentially rewrites it. And Justice Pearce's approach at least arguably amounts to an amendment of the constitution. We should be wary of endorsing this reading, particularly in a case in which the question is not squarely presented or briefed.

¶152 Second, Justice Pearce's reading risks introducing a circular loop of uncertainty into our assessment of the scope of the power of our three branches of government. Justice Pearce views *Young* as prescribing a standard that says that the legislature is not limited to exercising legislative power, but only prohibited from fulfilling functions appertaining to the executive and judicial branches, and that the executive is not limited to executive power but only from taking on tasks belonging to the other branches.

¶153 This reading devolves to a logical impossibility. As a logical matter we cannot define the powers of each of our three branches of government by only a negative reference to the powers of the other two. Without a preconceived notion of what it means to be "judicial," "executive," and "legislative," we could never deduce the content of any given one of those powers with only the knowledge that it is "not the other two." That type of circular reasoning yields no independent information.

¶154 The Utah Constitution, moreover, does not define the powers of the branches of our government in this reductive way. Article VI lists a series of limitations on the exercise of legislative power—including the time for the beginning of the annual session of the legislature (the fourth Monday in January), UTAH CONST. art. VI, § 2, qualifications for office (at least twenty-five years of age and a resident of the district from which the person is elected), *id.* art. VI, § 5, terms for expulsion of a legislator "for cause" (upon a two-thirds vote of "all the members elected"), *id.* art. VI, § 10, and requirements for a "quorum" for each house to "transact business" (a "majority of the members of each house"), *id.* art. VI, § 11. Surely these restrictions are binding on the legislature. The legislature could not choose to begin its session on a different date, alter the qualifications for office, expel a member on less than a two-thirds vote, or transact business with less than the quorum required by Article VI. These are enforceable limits on the legislative power. And the legislature is not entitled to ignore them on the ground that ignoring them would not involve the exercise of "executive" or "judicial" power.

¶155 The same goes for limits on the executive power. Article VII (among other things) sets qualifications for constitutional offices within the executive department, *id.* art. VII, § 3, authorizes the

governor to appoint a committee to investigate the condition of "any executive office or state institution" "at any time when the Legislature is not in session," *id.* art. VII, § 5, and prescribes terms and conditions for the governor to fill vacancies in "any State or district office" (including by stating that the governor's appointment "shall expire at the next election"), *id.* art. VII, § 9. Again these are enforceable limits. Perhaps a governor might wish to override some of them. But he could not properly do so—and surely not on the ground that an executive act in contravention of these provisions does not amount to "legislative" or "judicial" power.

¶156 This same framework should at least arguably hold for Article VIII limits on the judicial power. We have long interpreted the terms of that article to impose limits on our authority—in doctrines of justiciability, standing, and a general requirement of adversariness.[110] And we could not override those limits just because our act does not amount to "legislative" or "executive" power.

¶157 A hypothetical may help highlight the concern. Suppose the legislature enacts a statute requiring courts to issue advisory opinions. Under Justice Pearce's approach, we would analyze the

---

[110] I agree with Justice Pearce that an originalist inquiry should govern our interpretation of Article VIII. *Supra* ¶ 86. Unlike Justice Pearce, however, I do not believe that the doctrines of justiciability, standing, and a general requirement of adversariness are founded on "parrot[ed] language about the meaning of our constitution purloined from cases." *Supra* ¶ 86. I see these doctrines as deriving from the original meaning of Article VIII. *See supra* ¶¶ 105-35 (discussing Article VIII's adversariness requirement); *Gregory v. Shurtleff*, 2013 UT 18, ¶¶ 72–92, 299 P.3d 1098 (Lee, J., concurring in part and dissenting in part) (discussing Article VIII's standing requirement and tracing the roots of this doctrine in the original understanding of the "judicial power"); *Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶¶ 17–27, 289 P.3d 582 (discussing Article VIII's prohibition on issuing advisory opinions and the mootness doctrine). Perhaps some of our opinions have been sparse on "serious originalist" analysis. *Supra* ¶ 86. But it does not follow that their conclusions are therefore unoriginalist. And it certainly does not follow that we should be calling these decisions into question here—in a case that does not implicate these issues, and in which we have absolutely no adversarial briefing. *See supra* ¶ 101 n.95.

constitutionality of such a statute by applying the *Young* framework. We would first ask whether the courts are "charged with the exercise of powers properly belonging to one of the three branches of government." *In re Young*, 1999 UT 6, ¶ 8 (internal quotation marks omitted). This question as applied here is nonsensical; it asks whether a branch of government is charged with exercising the powers properly belonging to a branch of government. That highlights the difficulty of extending the *Young* test to an assessment of branches of government. But assuming the test applies we would of course conclude that courts are "charged with the exercise" of "judicial power"—a power belonging to the judicial branch. UTAH CONST. art. VIII, § 1.

¶158   The next question would be whether the function that the statute has assigned to the courts is one "appertaining to" another branch of government. This question is more difficult to answer. It would turn on whether issuing advisory opinions is a function "essential, core, or inherent" in the powers exercised by the legislative or executive branches. *In re Young*, 1999 UT 6, ¶¶ 8, 26.

¶159   The issuance of advisory opinions resembles a legislative function. But I do not believe that it is a function *essential* to legislative power. "Legislative power . . . is the authority to make laws . . . ." *Rampton v. Barlow*, 464 P.2d 378, 381 (Utah 1970). It "generally (a) involves the promulgation of laws of general applicability; and (b) is based on the weighing of broad, competing policy considerations." *Carter v. Lehi City*, 2012 UT 2, ¶ 34, 269 P.3d 141. Advisory opinions resemble laws promulgated by the legislature in that they provide generally applicable rules without resolving a specific controversy. But advisory opinions are not based only "on the weighing of broad, competing policy considerations." They are often based on a court's understanding of the governing text of existing law (in statutes, state and federal constitutions, and precedent). So I doubt that we can say that an *essential* function of legislative power is the issuance of advisory opinions.

¶160   Nor do I think we can say that the issuance of advisory opinions is a function essential to the exercise of executive power. "Executive acts typically are based not on broad policy grounds, but on individualized, case-specific considerations as to whether the acts of a particular person fall within the general rule adopted by the legislature." *Id.* ¶ 47. They "encompass[] prosecutorial or administrative acts aimed at applying the law to particular individuals or groups based on individual facts and circumstances." *Id.* ¶ 34. Advisory opinions, in contrast, resolve questions in the

abstract without application to particular individuals or groups. I therefore doubt that the issuance of advisory opinions is a function "essential, core, or inherent" in executive power. And if issuing advisory opinions is not an essential legislative or executive function, the *Young* analysis ends and the statutory directive to the courts would be deemed constitutional.

¶161 That conclusion would be deeply unsettling. "[W]e have unequivocally declared that 'courts are not a forum for hearing academic contentions or rendering advisory opinions.'" *Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union*, 2012 UT 75, ¶ 19, 289 P.3d 582 (quoting *Baird v. State*, 574 P.2d 713, 715 (Utah 1978)). And we have stated that "whatever else the judicial power clause may imply, it incorporates a prohibition on the issuance of advisory opinions by our courts." *Id.* ¶ 23. Yet under Justice Pearce's reading of Article V, the legislature can require the courts to issue such opinions so long as that function is not a core or essential function of executive or legislative power.

¶162 Justice Pearce seems untroubled by this conclusion. In his view, "there is work to be done" before we can definitively say that the issuance of advisory opinions is beyond the scope of the judicial power recognized in our constitution. *Supra* ¶ 93. He acknowledges that we have previously held that our constitution prohibits us from issuing advisory opinions. *See, e.g.*, *Utah Transit Auth.*, 2012 UT 75, ¶¶ 19–23. But he argues that "the analytical path we took to reach that conclusion suggests there is room for additional originalist examination." *Supra* ¶ 88. Perhaps additional originalist analysis would be helpful. And I provide some below. *Infra* ¶¶ 163–68. But we should not be reconsidering such an extensive body of case law here, especially when these issues are not properly before us and we lack briefing on them. Again, I oppose this extensive foray engaged in by my colleague. *See supra* ¶ 101 n.95. I offer my views reluctantly, and only as a response to Justice Pearce.[111]

---

[111] We have repeatedly held that "[t]his [c]ourt was not intended to be, nor is it endowed with authority to render advisory opinions." *State v. Stromquist*, 639 P.2d 171, 172 (Utah 1981) (per curiam). These pronouncements seem to me to be deserving of deference as a matter of *stare decisis*. *Stare decisis* is admittedly at its strongest when a constitutional decision is backed by persuasive legal reasoning and correct as a matter of original meaning. *See State v. Rowan*, 2017 UT 88, ¶ 37, 416 P.3d 566 (Lee, A.C.J., concurring); *Eldridge v. Johndrow*,

(Continued)

¶163   The text of Article VIII itself "does little to reveal the precise scope of the judicial power." *Utah Transit Auth.*, 2012 UT 75, ¶ 20. But that does not mean that our authority is without limits. We must engage in "an analysis of the traditional nature of the judicial power and of the types of writs and cases traditionally resolved in the courts" to understand the scope of our authority. *Gregory v. Shurtleff*, 2013 UT 18, ¶ 74, 299 P.3d 1098 (Lee, J., concurring in part and dissenting in part). And the issuance of advisory opinions has long been understood to fall outside the traditional understanding of the judicial power.

¶164   By the time Utah ratified its Constitution in 1895, federal courts had reached a consensus. They had concluded that the judicial power did not include the power to issue advisory opinions. This common ground was first established in 1793. Writing to Chief Justice Jay, Thomas Jefferson asked the court for advice on certain questions of law. 3 H. JOHNSTON, CORRESPONDENCE AND PUBLIC PAPERS OF JOHN JAY, 486–87 (1891). Chief Justice Jay respectfully declined to answer those questions, reasoning that doing so would overstep the court's limited judicial power. *Id.* at 488–89. This concept of judicial power was repeatedly emphasized by the Supreme Court in the decades that followed. *See, e.g.*, *Smith v. Adams*, 130 U.S. 167, 174 (1889); *Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885) ("If . . . we should assume the plaintiff's case to be within the terms of the statute, we should have to deal with it purely as an hypothesis, and pass upon the constitutionality of an act of congress as an abstract question. That is not the mode in which this court is accustomed or willing to consider such questions."); *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 819 (1824) ("[The judicial] power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law."); *supra* ¶ 106 n.97.

¶165   One explanation for this long-standing prohibition on advisory opinions relates to the "case" or "controversy" language of Article III in the United States Constitution. *See Muskrat v. United*

---

2015 UT 21, ¶ 22, 345 P.3d 553. And as Justice Pearce rightly points out, some of our decisions on the subject of advisory opinions lack originalist analysis. *Infra* ¶ 162. But we did provide such analysis in *Utah Transit Authority*. *See* 2012 UT 75, ¶¶ 20–23. So at least that opinion is entitled to deference under the doctrine of *stare decisis*. I see no basis for calling that decision into question here.

*States*, 219 U.S. 346, 356–58 (1911). Our state constitution admittedly lacks such language. But for reasons noted above, I do not see that as a barrier to looking to federal law to better understand what the phrase "judicial power" meant in 1895. *Supra* ¶¶ 131 & n.104. And in any event, many state courts in 1895 likewise understood the scope of their "judicial power" to be limited to resolving actual cases or controversies—this despite the lack of "case" or "controversy" language in their state constitutions. *See Utah Transit Auth.*, 2012 UT 75, ¶ 23 ("Several states had already discarded or abandoned the practice of issuing advisory opinions, ruled their issuance to be beyond the scope of the judicial power recognized in their constitutions, or omitted such a provision from a later version of their constitution (not to mention those states that disdained the practice from the outset)." (citations omitted)).

¶166 Some state courts, however, did not follow this practice. *See, e.g.*, *In re Advisory Opinion*, 5 So. 613 (Fla. 1889); *In re Opinion of the Court*, 62 N.H. 704 (1883). But this was largely because their state constitutions explicitly permitted the courts to issue advisory opinions. *See, e.g.*, FLA. CONST. art. V, § 16 (1868); N.H. CONST. pt. 2, art. 74 (1784). The clear consensus in 1895 was that state courts lacked the authority to issue advisory opinions unless their state constitutions expressly provided otherwise. *See, e.g.*, *In re Reply of the Judges*, 33 Conn. 586, 587 (1867) (noting that in states where the practice of issuing advisory opinions prevails, "there is some constitutional provision for it," and holding that where Connecticut's constitution was silent on the subject, the practice was not permissible); *In re Application of Senate*, 10 Minn. 78 (1865) (holding unconstitutional an act conferring advisory functions on the state supreme court). We followed this approach in the decades following ratification of our constitution. *See, e.g.*, *Univ. of Utah v. Indus. Comm'n of Utah*, 229 P. 1103, 1104 (Utah 1924). All this evidence points to the conclusion that the "judicial power" as understood in 1895 did not encompass the power to issue advisory opinions.

¶167 Justice Pearce notes that section 22 of our original constitution provided that "District Judges may, at any time, report defects and omissions in the law to the Supreme Court, and the Supreme Court, on or before the first day of December of each year, shall report in writing to the Governor any seeming defect or omission in the law." UTAH CONST. art. VIII, § 22 (1895). And he claims that this language "demonstrates that the framers envisioned that this court would have the ability to do more than decide cases

between adverse parties and would, at least in one annual report, opine on what the law should be." *Supra* ¶ 94. Again I'm troubled by the foray into yet another wrinkle in a complex area of constitutional law—in a case in which these issues are not presented for our decision, and in which we lack adversarial briefing. But because Justice Pearce has opened the door, I see the need to provide a response (to round out the picture—lest the bench and bar see only a partial one presented by a minority of this court). *See supra* ¶ 101 n.95. And again I see the matter differently. I am not suggesting that the sole power that this court possesses is to resolve "cases between adverse parties." I am simply suggesting that we are limited to exercising the "judicial power" as set forth in Article VIII. And that power does not include the power to issue advisory opinions.

¶168   Section 22 seems to fit within our longstanding tradition of collaborating with the other branches of government to improve the law.[112] We may meet with the Governor and legislative leadership to discuss matters of mutual concern. We provide regular presentations on budget needs and discuss matters related to the administration of the law. *See* UTAH R. JUD. ADMIN. 3-406. (prescribing standards for the judicial council to take positions on proposed legislation). Legislative and executive staff may attend meetings of the Judicial Council and of advisory committees of this court. And during the legislative session, we provide advice on matters of concern to the justice system. *See id.* 3-106 (prescribing standards for the judicial council to take positions on proposed legislation). So I don't see section 22's mandate that the court issue a "report in writing to the Governor" to be at odds with our court's understanding of "judicial power."

---

[112] The Chief Justice of this court made this point in his 1996 State of the Judiciary speech. He noted that for one hundred years our branches of government have engaged in a "collaborative effort" to address "issues of common concern." Michael D. Zimmerman, Chief Justice of the Utah Supreme Court, The State of the Judiciary (Mar. 1996). Section 22 of the original constitution, he stated, helped serve this purpose. *Id.* That "particular provision . . . was removed in the 1985 revision of the judicial article as surplusage, but the tradition continues of the judiciary frequently consulting and working with the other branches on matters affecting the administration of justice." *Id.*

¶169 Reports to the Governor, moreover, seem distinct from advisory opinions. Though advisory opinions are generally not considered to be binding authority,[113] they are typically treated as *de facto* precedent.[114] They usually are written like adjudicated decisions, using the same techniques of legal reasoning and reliance on precedent. They are often published in the official court reports.[115] And they sometimes follow after briefing[116] or even oral argument.[117] Without digging through state archives, it's difficult to know the content of the reports submitted in accordance with section 22. But if they're anything like the inter-branch reports we provide today, they lack some of the hallmark characteristics of advisory opinions noted above.

¶170 Even if we were to conclude that these reports resemble advisory opinions, I question why the proper implication to draw is that our "judicial power" encompasses the power to issue advisory opinions generally, or that our power is somehow limitless. And yet this is what Justice Pearce suggests. He states that the language of section 22 "demonstrates that the framers envisioned that this court would have the ability to do more than decide cases between adverse parties." *Supra* ¶ 94. I think that the far better implication to

---

[113] *Opinion*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "advisory opinion" as "[a] nonbinding statement by a court of its interpretation of the law on a matter submitted for that purpose").

[114] Mel A. Topf, *State Supreme Court Advisory Opinions as Illegitimate Judicial Review*, 2001 L. REV. MICH. ST. UNIV.-DET. C. L. 101, 129–30 ("Like that which looks like a duck, walks like a duck and quacks like a duck, advisory opinions have looked, behaved and sounded like adjudicated decisions, and they have, not unreasonably, been perceived and employed, as such.").

[115] *See, e.g.*, C. Dallas Sands, *Government by Judiciary — Advisory Opinions in Alabama*, 4 ALA. L. REV. 1, 26 (1951).

[116] *See, e.g.*, FLA. CONST. art. IV, § 1(c) ("The justices shall, subject to their rules of procedure, permit interested persons to be heard on the questions presented . . . .").

[117] *See, e.g.*, *Submission of Interrogatories on Senate Bill 93-74*, 852 P.2d 1, 3 (Colo. 1993) (en banc) (noting that the court heard oral argument); *In re Request of the Governor for an Advisory Opinion*, 12 A.3d 1104, 1108 (Del. 2009) (same); *Advisory Opinion to the Governor — 1996 Amendment 5 (Everglades)*, 706 So. 2d 278, 281 (Fla. 1997) (same).

draw is that the framers envisioned that the courts would have the power to do exactly what section 22 permits—provide the Governor with a written report detailing "seeming defect[s] or omission[s] in the law." Section 22, in other words, functions as a limited exception to the general rule.

¶171   Under Justice Pearce's expansive reading of section 22, the courts could engage in practices that exceed the scope of Article VIII's "judicial power." What, for instance, would stop the courts from engaging in legislative rulemaking?[118] We could decide to

---

[118] Justice Pearce responds by asserting that "[t]he answer is simple; article V of the Utah Constitution would" prohibit the courts from exercising this authority. *Supra* ¶ 94 n.90. Justice Pearce says that "[p]assing legislation is a function 'appertaining to' the legislative department," and he concludes that "we cannot legislate without express constitutional authorization." *Supra* ¶ 94 n.90. I agree with this conclusion but would identify a different basis for it. I would say that the courts lack authority to enact rules that amount to legislative policymaking because this exceeds the bounds of our authority under article VIII. In my view, such rules are beyond the "judicial power," which extends to the authority to "issue all extraordinary writs," to "adopt rules of procedure and evidence," and to exercise "original jurisdiction in all matters except as limited by th[e] constitution or by statute," and to exercise "appellate jurisdiction as provided by statute." UTAH CONST. art. VIII, §§ 1, 3, 4 & 5.

Justice Pearce agrees with this conclusion but seeks to root it in the language of article V. But even Justice Pearce's approach highlights the constitutional difficulty with the notion of the judicial power to issue advisory opinions. The issuance of such an opinion (in the absence of adversary parties) is the functional equivalent of legislation. When a court issues an "opinion" that does not resolve an adversary dispute it is announcing a controlling principle of law in the abstract. And that is the essence of legislation. It should not matter, moreover, whether the form of that legislation is in a promulgated rule or in an advisory opinion. Either way it's legislation. And either way it's a violation of the principle of separation of powers.

I would reach that conclusion as a matter of interpretation of the terms and conditions of article VIII of the Utah Constitution. But Justice Pearce's approach leads to the same conclusion. If legislative policymaking in the form of a promulgated "rule" is an

(Continued)

adopt a section from the Restatement of Employment Law through our rulemaking power. And we could do so in the absence of a justiciable controversy—all because section 22 supposedly implies that the courts have the power to do more than decide cases between adverse parties. Perhaps we would never do this. We might, as Justice Pearce suggests, decide that "there are very good reasons" to avoid such a practice. *See supra* ¶ 94 n.91. But prudential concerns cannot be the only barrier preventing us from engaging in legislative rulemaking.

¶172 The advisory opinion hypothetical also highlights my final concern with Justice Pearce's approach. We have never defined what constitutes the "essential, core, or inherent" functions and powers of each branch. *See In re Young*, 1999 UT 6, ¶ 26. And I believe we must if we are going to use Justice Pearce's framework to assess the powers of our branches of government. We could, of course, attempt to define the essential powers of each branch on a case-by-case basis. But that reintroduces the problematic circular reasoning discussed above. *Supra* ¶¶ 152-53. We cannot know whether the judiciary can be tasked with a particular function unless we understand the full scope of the executive and legislative powers. And we cannot know the full scope of those powers until we define all the essential functions and powers of those branches.

### III

¶173 For all of these reasons I am skeptical of the framework put forward by Justice Pearce. I see no reason to reach these questions here, and would prefer that we leave them for a future case in which we have adversary briefing. But I outline my concerns in an attempt to provide a counter-balance to the views propounded by Justice Pearce.

───────────────

unconstitutional attempt to "pass[] legislation," *supra* ¶ 94 n.90, then legislative policymaking in the form of an advisory opinion is equally so. I see no basis in logic or in law for the conclusion that we lack the authority to "legislate" by promulgating a formal rule but could achieve the same outcome by reformulating the rule as an "opinion."